[No. S113086. July 1, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
GAYLON MICHAEL MAJORS, Defendant and Appellant.

COUNSEL

Patricia J. Ulibarri, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry J. T. Carlton, Steven T. Oetting and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROWN, J.**—A victim enters the defendant's vehicle under an implicit threat of arrest. Does this evidence satisfy the force or fear element of simple

kidnapping? (Pen. Code, § 207, subd. (a) (hereafter section 207(a)).)[1] We conclude it does, and therefore reverse the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 15, 2000, 18-year-old Alesandria M. was riding home on her bicycle. She was an employee at the Zany Brainy store at Mira Mesa Market Center. Earlier that day, Alesandria had purchased a gift at Zany Brainy for her brother's birthday. Just prior to starting home, Alesandria returned to Zany Brainy and made a second purchase.

After Alesandria had been riding for approximately 10 to 15 minutes, defendant Gaylon Michael Majors, wearing sunglasses and standing in the street next to a white van, flashed a badge and asked her to stop. He told her he was a security guard at the Mira Mesa mall and had received a call saying someone on a bicycle was suspected of a theft at the Zany Brainy store. Alesandria got off her bike and showed defendant the items in her backpack, her payment receipts, and her identification. Defendant told Alesandria she would have to return with him to the store and speak to the security guard to resolve the issue. He tried to put her bike in the van, but it did not fit, so he "said to go ahead and lock my bike up at the school right across the street." While Alesandria did so, defendant took her backpack and put it in the van.

When she returned to the van, Alesandria asked to see defendant's badge again. While defendant was not in uniform, Alesandria testified that "I felt scared that maybe if he was undercover or something like that I would get in more trouble. So I took his badge again. I was not really sure what to look for." The badge said "security guard" on it. On the other side of the badge was an orange laminated card. Alesandria did not ride off because she "was really scared that if . . . he was who he said he was, that I would be in jail, that I would have to explain to my parents why I was there, even though I knew inside that I was innocent of stealing."

Alesandria testified she was afraid she would be arrested if she did not get into the van. She believed defendant had the authority to arrest her because he displayed a badge and identified himself as a security officer. Alesandria had never dealt with the police before, and was afraid not to get in the van. She testified, "I believed what he said about being a security guard and that we would have to go back to the . . . mall, to clear things up. And I actually worked at Zaney Brainey [sic], so I was confident about getting the manager to clear everything up for me." "He told me I would have to go with him." "I requested to see his badge because I didn't believe him. But at the same time

---

[1] All further statutory references are to the Penal Code.

I didn't want to not believe him if he was telling the truth. I didn't want to make a situation worse than it had already been." Defendant did not do anything to cause her to be afraid for her safety before she got into the van. He did not display any weapons, threaten, or touch Alesandria until they parked at the mall.

Once Alesandria and defendant were in the van, defendant appeared to make a call on his cell phone. "He made it sound like maybe he was talking to a partner or somebody, saying that the suspect was apprehended." Alesandria asked if she could call her parents. Defendant told her "that we could once we got there." Once they arrived at the mall, defendant said "they were going to have to check with the manager to see if they could look at their cameras." This caused Alesandria apprehension, apparently because she knew from her employment there were no cameras at Zany Brainy.

Defendant ultimately drove to an isolated area of the mall. Alesandria started to get out of the van, but defendant grabbed her by the hair and slammed her head into the passenger side window. He then pulled back her hair so she was facing him, told her to go to the back of the van, and said he would not hurt her. Alesandria grabbed for defendant's throat, but defendant grabbed her head again, and tried to force her head between her legs. He ultimately threw her into a bench seat in the back of the van, and told her if she cooperated he would not hurt her. He then straddled her, pinning her arms to her chest, and struck her twice on the side of her head saying, "I don't want to be mean to you, so just do what I say." Alesandria was screaming and crying, and kicking defendant. Defendant asked Alesandria if she wanted to die, and she said yes. Defendant said, "Okay, you are going to die." Alesandria continued to kick defendant, and he eventually released her, saying, "Get out bitch." Alesandria reported the matter to a security guard and the police.

Defendant's fingerprint was found on one of Alesandria's Zany Brainy purchase receipts. Defendant was also positively identified at trial by a woman who lived at the location where defendant initially stopped Alesandria. On the day of his arrest, defendant was seen driving a white van. When arrested, he was in possession of a canvas briefcase containing an orange laminated card, sunglasses, binoculars, a digital camera, and a dildo.

The jury was instructed that both kidnapping for rape and simple kidnapping required proof beyond a reasonable doubt that Alesandria "was unlawfully moved by the use of physical force or by any other means of instilling fear," and that her movement was "without her consent." "Consent" was defined as "act[ing] freely and voluntarily and not under the influence of threat, force, or duress. . . . Consent requires a free will and positive

cooperation in act or attitude." With respect to the crimes against Alesandria,[2] defendant was convicted of kidnapping for rape (§ 209, subd. (b)(1)), simple kidnapping (§ 207(a)),[3] assault with the intent to commit rape (§ 220), and false imprisonment by violence and menace (§§ 236, 237, subd. (a)).

A divided Court of Appeal reversed defendant's convictions for kidnapping and kidnapping for rape for insufficiency of the evidence regarding the element of force or fear. The majority stated, "This case appears to be a classic case of asportation by fraud, not by force or fear." In all other respects as to the crimes against Alesandria, the judgment was affirmed.

We granted the Attorney General's petition for review to consider whether evidence that a victim entered a defendant's vehicle under threat of arrest is sufficient to satisfy the force or fear element of section 207(a) kidnapping.

## II. DISCUSSION

Section 207(a) provides, "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another . . . county, or into another part of the same county, is guilty of kidnapping." The language "any other means of instilling fear" was added in 1990. (Stats. 1990, ch. 55, § 1, p. 393.) Section 207(a) expressly "do[es] not apply to . . . : [¶] . . . [¶] . . . any person acting under Section 834[4] or 837."[5] (§ 207, subd. (f)(2).)

■ As can be seen by this language, in order to constitute section 207(a) kidnapping, the victim's movement must be accomplished by force or any other means of instilling fear. We have observed that even prior to the 1990 amendment adding the language "any other means of instilling fear," our cases held "that a taking is forcible if accomplished through fear." (*People v. Hill* (2000) 23 Cal.4th 853, 856 & fn. 2 [98 Cal.Rptr.2d 254, 3 P.3d 898] (*Hill*).) As these earlier cases explain, the force used against the victim "need

---

[2] Defendant was also charged with crimes unrelated to this victim or the issue before us. Hence, we do not discuss them further.

[3] Section 207 provides in relevant part: "(a) Every person who forcibly, or by any other means of instilling fear, *steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping.* [¶] . . . [¶] (f) Subdivisions (a) to (d), inclusive, do not apply to any of the following: [¶] . . . [¶] (2) To any person acting under Section 834 or 837."

[4] Section 834 provides: "An arrest is taking a person into custody, in a case and in the manner authorized by law. An arrest may be made by a peace officer or by a private person."

[5] Section 837 provides: "A private person may arrest another: [¶] 1. For a public offense committed or attempted in his presence. [¶] 2. When the person arrested has committed a felony, although not in his presence. [¶] 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."

not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances." (*People v. Stephenson* (1974) 10 Cal.3d 652, 660 [111 Cal.Rptr. 556, 517 P.2d 820] (*Stephenson*); see also *People v. Camden* (1976) 16 Cal.3d 808, 814 [129 Cal.Rptr. 438, 548 P.2d 1110] [section 207(a) "encompasses any movement of a victim which is substantial in character [citation], and accomplished by means of force or threat of force"]; *People v. Guerrero* (1943) 22 Cal.2d 183, 189 [137 P.2d 21] [the gravamen of the offense of kidnapping is "some form of compulsion"]; *People v. Dagampat* (1959) 167 Cal.App.2d 492, 495 [334 P.2d 581] (*Dagampat*) ["The requisite force or compulsion need not consist of the use of actual physical force or of express threats"].) We have also observed that the concepts of consent and force or fear "are clearly intertwined." (*In re Michele D.* (2002) 29 Cal.4th 600, 609 [128 Cal.Rptr.2d 92, 59 P.3d 164] (*Michele D.*) [addressing force]; *Hill*, at p. 855 [kidnapping generally must be "against the will of the victim, i.e., without the victim's consent"].)

These alternative bases for committing kidnapping, i.e., "forcibly, or by any other means of instilling fear," while stated in the disjunctive, are not mutually exclusive. As noted, prior to the 1990 addition of the language "any other means of instilling fear," we had held that threats of force satisfy the force element of section 207(a). Given the similarity between a "threat of force" and "any other means of instilling fear," there are inevitably now circumstances that constitute both force and fear within the meaning of this statute. As the Attorney General notes, "the mechanism by which a threat of force produces the movement of the victim necessary for a kidnapping is fear, specifically, the fear that the threat of force will be carried out."

In contrast to the use of force or fear to compel asportation, "asportation by fraud alone does not constitute general kidnapping in California." (*People v. Davis* (1995) 10 Cal.4th 463, 517, fn. 13 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Green* (1980) 27 Cal.3d 1, 64, 63 [164 Cal.Rptr. 1, 609 P.2d 468] ["defendant tricked [victim] into believing she was simply being taken on a quick trip to her sister's house and back"], overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 [83 Cal.Rptr.2d 533, 973 P.2d 512] and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].) This long-standing rule is premised on the language of section 207, which for general kidnapping, at issue here, requires asportation by force or fear, but for other forms of kidnapping proscribes movement procured only by "fraud," "entice[ment]," or "false promises." (§ 207, subds. (a)–(d); see *People v. Stanworth* (1974) 11 Cal.3d 588, 602–603 [114 Cal.Rptr. 250, 522 P.2d 1058], overruled on other grounds in *Martinez*, at p. 237; *People v. Rhoden* (1972) 6 Cal.3d 519, 526–527 [99 Cal.Rptr. 751, 492 P.2d 1143].)

Thus, in *Stephenson, supra,* 10 Cal.3d 652, we reversed two kidnapping convictions. (*Id.* at pp. 659–660, 662.) In one, the victim entered the vehicle voluntarily because he thought it was a taxi. (*Id.* at p. 656.) In the other, the victim accepted a ride from a stranger. (*Id.* at p. 657.) We concluded the victims "were enticed to get voluntarily into defendant's car by deceit or fraud." (*Id.* at p. 659.)

By contrast, in *People v. La Salle* (1980) 103 Cal.App.3d 139, 143, 146 [162 Cal.Rptr. 816] (disapproved on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480, 496, fn. 12, 498 [244 Cal.Rptr. 148, 749 P.2d 803]), the victim entered the car not voluntarily, but because the defendant had her two-and-a-half-year-old daughter in the car, and could have driven away with her. While "she was afraid to get into the car, she was more afraid not to get in, because of what could happen to her daughter . . . . [S]he felt she had no choice but to cooperate. The jury was entitled to conclude that this was not a case of inducement by fraud or deceit, but one wherein the victim was *forced* to consent to defendant's demands." (*La Salle,* at p. 146; *Dagampat, supra,* 167 Cal.App.2d at p. 495 ["court could reasonably have found that [victim] did not willingly enter the car, but did so because of a fear of bodily harm induced by [one defendant's] order to get into the convertible, defendants' 'dirty looks,' the sudden approach of [another member of defendants' group] from the drugstore, and his recollection of the fight in which" the other defendant stabbed a different victim].)

Of course, it goes without saying that asportation may be accomplished by means that are both fraudulent and involve force or fear. For example, a defendant who claims to have a gun but who in fact does not could not successfully argue he induced the movement of the victims who credited his statement solely by fraud.

The question in this case is whether movement accomplished by the implicit but false threat of arrest satisfies the elements of force or fear in section 207(a), or whether such movement is simply asportation by fraud. While not addressing the precise factual scenario presented here, kidnapping cases involving fraudulent arrest date back over a century.

In *People v. Fick* (1891) 89 Cal. 144, 147, 152–153 [26 P. 759], we distinguished *Ex Parte Sternes* (1889) 82 Cal. 245 [23 P. 38], in which a deputy sheriff lawfully executed an arrest warrant, and upheld the kidnapping conviction of the defendant constable. In *Fick,* the defendant arrested the victim, but then took her to a house of "ill-fame." (*Fick,* at p. 147.) We

observed that the language of former section 207[6] "necessarily implies that the arrest and conveying to another county must be without the consent of the person injured, and without any lawful authority therefor . . . ." (*Fick*, at p. 150.) In response to the defendant's contention that his action was not kidnapping because "he was acting under a warrant," we stated, "it is not unreasonable to believe that [defendant], when he made the arrest, intended to do with his prisoner just what the evidence shows that he did do, and that he had no other purpose. In other words, that her arrest was simply a means to the end he had in view; that he never intended to take her before a magistrate, but did intend to place her [at the house of ill-fame]. Such an act was unlawful, and as the warrant under which [defendant] claims that he acted never authorized such a proceeding, it affords no justification for the act now under consideration." (*Id.* at pp. 151–152.) Because it was not at issue, we did not describe in *Fick* what force was used to effectuate the arrest.

In *People v. Broyles* (1957) 151 Cal.App.2d 428, 429 [311 P.2d 88], the defendants spotted a car parked in an isolated area. It was occupied by a man and a woman. Defendant Broyles turned a flashlight into the car "and told the occupants that he was a special deputy sheriff patrolling the back roads, that what they were doing was wrong, and that he would have to take them in." (*Ibid.*) He asked to see the man's driver's license. Broyles then sent codefendant Gully back to their car to see if the couple "had a record and if the car was stolen." (*Ibid.*) Gully came back saying there was no record and the car was not stolen. Broyles told the man he would have to take the woman "down to the station." (*Ibid.*) The woman entered the defendants' car "believing that these were police officers." (*Ibid.*) Gully later made a statement that during the drive "he could hear crying in the back seat and could hear 'somebody getting hit.' " (*Id.* at p. 430.) The Court of Appeal rejected Gully's claim of insufficient evidence and upheld his kidnapping conviction, stating, "There was ample evidence that the victim . . . was induced to enter the car driven by [Gully] by the representations made by these parties that they were police officers; that she believed these representations, and acted through fear; that they forced her into their car by giving orders which she felt compelled to obey; and that some force was used while she was being transported over a space of several miles. The evidence is sufficient to show the crime of kidnaping." (*Id.* at pp. 430–431.)

In *People v. Harris* (1944) 67 Cal.App.2d 307, 308–309 [154 P.2d 442], the defendant stated to two 15-year-old boys, William and Henry, that he had been sent by the Dallas County Sheriff to get a particular boy. When William asked the defendant if he had any identification demonstrating he was an

---

[6] In 1891, section 207 provided in relevant part: "Every person who forcibly steals, takes, or arrests any person in this State, and carries him into another . . . county, . . . is guilty of kidnaping." (1872 Pen. Code, § 207.)

officer, the defendant said, " ' "Never mind," ' " and that they " 'must go and get in the car.' " (*Id.* at p. 309.) When William started to walk away from the car, the defendant said, " ' "If you don't want a damned broken leg you had better come back here, boy." ' " (*Ibid.*) Defendant ultimately said he had to take Henry " ' "down". . . . "If you are not the one, . . . I will bring you home or see you get back home." ' " (*Id.* at pp. 309–310.) Henry testified, " 'I thought that he was a plain clothes police officer, and I was kind of afraid. . . . Then I got in the car.' " Henry was subsequently sexually assaulted, and the defendant convicted of kidnapping and oral copulation. (*Id.* at pp. 307, 310.)

The Court of Appeal in *Harris* observed that while the defendant "makes no argument and cites no authority in support of the claim that his conviction of the crime of kidnaping is unsupported by the evidence, we feel that such claim is effectually refuted by the recent case of *People v. Brazil* (1942) 53 Cal.App.2d 596 [128 P.2d 204]. There, a gun was exhibited and the complaining witness was told to get into the automobile because the defendant was going to take her to the police station. While no gun was displayed in the instant case, the orders of the defendant were carried out under fear induced by oral threats. Henry testified, when asked whether he got into the car willingly: 'Well, he threatened my friend and I thought that he was a plain clothes police, and so I got in the car to keep from having any trouble, because I didn't want to get in any trouble with no police.' " (*People v. Harris, supra,* 67 Cal.App.2d at p. 310.)

As can be seen, none of these cases directly hold that an implicit threat of arrest satisfies the force element of the kidnapping statute. In *Fick*, the force used to effectuate the arrest was not described. However, nothing in that case suggests that in order to constitute kidnapping, the arrest had to involve anything other than an assertion the victim was required to accompany the officer. In *Broyles*, it is unclear whether the Court of Appeal concluded the totality of the evidence was sufficient to demonstrate kidnapping, or whether it had alternative bases for its holding, i.e., that the evidence demonstrated kidnapping both when the victim entered the car because of orders from apparent police officers she felt compelled to obey, and when force was later applied during the asportation. In *Brazil*, a gun was used in effectuating the "arrest." And in *Harris*, prior to the victim's entry into the defendant's vehicle, the defendant threatened to break the leg of the victim's companion if he ran away.

Nevertheless, defendant fails to cite a single case in which asportation accomplished by the threat of arrest was found to be movement motivated solely by fraud. Indeed, implicit in the language of section 207, subdivision (f)(2), which creates an exception to the kidnapping statute for

lawful arrest by a peace officer or a private person, is the Legislature's understanding that *unlawful* arrest may, under certain circumstances, be a form of kidnapping. As we have observed in a somewhat different context, "[p]olice officers occupy a unique position of trust in our society. . . . They are given the authority to detain and to arrest . . . . Those who challenge an officer's actions do so at their peril . . . ." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 206 [285 Cal.Rptr. 99, 814 P.2d 1341]; *Policemen's Benevolent Assoc. of New Jersey v. Township of Washington* (3d Cir. 1988) 850 F.2d 133, 141 [police officers exercise "the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them"].)

As observed above, the concepts of consent and force or fear with regard to kidnapping are inextricably intertwined. (See *Michele D.*, *supra*, 29 Cal.4th at p. 609.) Thus, in those cases in which the movement was found to be by fraud alone, and not force or fear, the circumstances suggest the victim exercised free will in accompanying the perpetrator. By contrast, the threat of arrest carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced. Thus, the use of force is implicit when arrest is threatened. Contrary to defendant's assertion, "being arrested" is not an "esoteric" fear that stretches the meaning of the statute. This is true regardless of whether the defendant used deception regarding the fact of the threatened arrest. The compulsion, which is the gravamen of the kidnapping crime, remains present.

■ We therefore conclude an implicit threat of arrest satisfies the force or fear element of section 207(a) kidnapping if the defendant's conduct or statements cause the victim to believe that unless the victim accompanies the defendant the victim will be forced to do so, and the victim's belief is objectively reasonable.

We further conclude there was substantial evidence here of force or fear, i.e., that Alesandria entered defendant's van under such implicit threat of arrest. In making this determination, we do not resolve evidentiary conflicts, but " 'view the evidence in a light most favorable to' " the People, " 'and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738]; *People v. Felix* (2001) 92 Cal.App.4th 905, 909–910 [112 Cal.Rptr.2d 311].)

First, there was substantial evidence Alesandria subjectively feared arrest. Alesandria testified she was afraid she would be arrested if she did not get into the van. She believed defendant had the authority to arrest her because he displayed a badge and identified himself as a security officer. Alesandria

had never dealt with the police before, and was afraid to not get into the van. "I requested to see his badge because I didn't believe him. But at the same time I didn't want to not believe him if he was telling the truth. I didn't want to make a situation worse than it had already been."

Moreover, Alesandria's belief that she would be arrested if she did not accompany defendant back to the mall was objectively reasonable. Defendant approached the victim, who had been riding her bike, and stopped her by holding up a badge. He identified himself as a security guard, and indicated he stopped her for a law enforcement purpose. Specifically, he told the victim he had received a call about a suspected theft from a store Alesandria had just visited twice, and that the suspected thief was someone on a bicycle. Defendant told Alesandria she "would have to go with him." He then exerted control over the victim's belongings, at first trying to put her bike into his van. When he saw that the bike would not fit, he told her to lock it up, thus depriving her of transportation. He then took her backpack and put it in the van. Once the victim was in the van, defendant continued the ruse in a manner that reinforced the notion that he had law enforcement authority and that the victim might be in criminal trouble: He made a phone call to tell his partner or some other interested person that "the suspect was apprehended" and refused the victim's request to call her parents, telling her she had to wait until they returned to the mall to do so.

 As the Attorney General notes, when defendant "implicitly threatened Alesandria with arrest if she did not get in the van and return with him to the mall to face the theft allegations, he necessarily threatened her with the possibility of force if she did not comply." This kind of compulsion is qualitatively different than if defendant had offered to give Alesandria a ride, or sought her assistance in locating a lost puppy, or any other circumstance suggesting voluntariness on the part of the victim. While defendant contends this is no more than a classic case of asportation by fraud, we disagree. As the Attorney General observes, defendant's "misidentification of himself and his implicit threats of false arrest were simply the vehicle for his conveyance of threats of force and fear that compelled Alesandria to get in his van." Thus, the evidence was sufficient to demonstrate a threat of force, and alternatively, that such a threat instilled fear in Alesandria that such force would actually be applied. Under either the force or the fear prong of the kidnapping statute, therefore, we conclude the evidence was sufficient.

Defendant asserts that Alesandria was not "afraid of some implicit threat of forcible arrest," but rather "got into the van to prove her innocence," and was "simply afraid of the possibility of going to jail." It is not obvious how these concepts of fear of "implicit threat of forcible arrest" and fear of "the possibility of going to jail" substantially differ. In any event, contrary to

defendant's assertions, we read the record as containing sufficient evidence from which a jury could reasonably conclude that Alesandria's movement was compelled by an implicit threat of arrest.

Defendant also asserts that the Attorney General has waived the argument that the asportation was accomplished by the threat of force because the prosecutor did not make this argument below. Rather, he contends the "prosecution's case-in-chief was built entirely on arguing the show of authority vitiated consent and instilled fear in Alesandria M. that compelled her to move." As noted earlier, there is little meaningful distinction and considerable overlap between the concepts of threat of force and instilled fear. Moreover, whether characterized as any other means of instilling fear or threat of force by the prosecution below, the prosecutor argued at length that the only reason Alesandria got into the van was because of defendant's show of authority and her fear she would be arrested, and hence her movement was not voluntary. Such argument focused the jury's attention on the evidence demonstrating both a threat of force and a threat that instilled fear in Alesandria. The jury was instructed that the victim's movement must be compelled by either force or fear, and was free to rely on either prong in reaching its verdict.

The Attorney General also asserts that the Legislature's 1990 addition of the language "any other means of instilling fear" "increase[s] the scope of liability for kidnapping to those who use fear *of any type* in order to compel the movement of their victims." He asserts this would include, for example, threatening to report a coworker to a supervisor for sexual harassment unless the coworker accompanies the defendant. He further asserts, "[a] kidnapper could threaten the property, reputation, or livelihood of the victim in order to compel the victim to comply with the kidnapper's demands."

Here, it is apparent that defendant's actions creating a threat of force would have constituted kidnapping even prior to the 1990 amendment to section 207(a), and that such a threat would also "instill[] fear" of the potential use of such force in the victim under the current wording of the statute. Because we conclude there was sufficient evidence Alesandria's movement was accomplished by threatened force and fear of that threatened force, we need not decide in this case what other forms of fear would also satisfy the amended statute. We note, however, in response to the Attorney General's suggested broad definition, that section 207(a) refers to "any other means of instilling fear," not to "any fear."

Moreover, our review of the legislative history of the 1990 amendment does not conclusively demonstrate that *any* fear would now satisfy section 207(a). For example, that history notes, "Although most kidnappings may be accomplished by the use of force, there are instances where the kidnapper

may accomplish the same by instilling fear in the victim. For example, the kidnapper may threaten to kill a family member. Thus, by expanding the definition of the crime to include such situations, the bill would close a potential loophole in the law." (Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 1564 (1989–1990 Reg. Sess.) as amended Jan. 16, 1990, p. 3.) This example of violence towards one close to the victim, rather than the victim herself, is categorically different from fear the perpetrator will not attend a high school prom with the victim, or other fears substantially removed from the use of force. Indeed, when we observed in *Hill, supra,* 23 Cal.4th 853, that our cases prior to the 1990 amendment had held "that a taking is forcible if accomplished through fear," we were referring to fear of "harm or injury from the accused." (*Id.* at p. 856, fn. 2, citing *People v. Alcala* (1984) 36 Cal.3d 604, 622 [205 Cal.Rptr. 775, 685 P.2d 1126], superseded by statute on other grounds; *Stephenson, supra,* 10 Cal.3d at pp. 659–660.) Thus, while we need not delineate in this case the precise parameters of the language "any other means of instilling fear," it is unlikely that by adding this language the Legislature intended to expand the crime of kidnapping to include movement compelled by fear of any and all negative consequences to the victim.

DISPOSITION

The judgment of the Court of Appeal is reversed, and the case remanded to that court for proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 11, 2004.