[No. C076235. Third Dist. Apr. 22, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
SERGIO ALVAREZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for partial publication, including the introduction, the Factual and Procedural Background, parts 1.1, 1.1.1, 1.1.2, 1.1.3, and 1.1.5 of the Discussion, and the Disposition.

## COUNSEL

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUTZ, J.**—While on patrol in his official capacity as a police officer in West Sacramento, defendant Sergio Alvarez induced five women he encountered to provide him sexual favors, often to avoid being taken to jail. A jury convicted defendant of multiple counts of aggravated kidnapping, oral copulation under threat of authority and by duress, and rape under threat of authority and by duress. The jury also sustained kidnapping, residential burglary, and multiple victim sentencing enhancements. He now appeals, asserting there is insufficient evidence to support a number of his convictions, and the trial court made various instructional and sentencing errors. In the published portion of the opinion (pts. 1.1, 1.1.1, 1.1.2, 1.1.3, and 1.1.5 of the Discussion, *post*) we address limitations on the lawful arrest defense to kidnapping. We will reverse the judgment as to several convictions, modify defendant's sentence as to others, remand for retrial as to one count, and otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

*Terri G. (Counts 1–3)*

Toward the end of August 2012, Terri G. was walking to her friend's house at about 4:00 a.m. when she was stopped by a police officer in a patrol car. Terri G. had been carrying methamphetamine that morning, but dropped it at a telephone booth before the officer stopped her. The officer pulled his car in front of her, got out of the car, and began searching through her purse. He

began looking through her phone, asking if she was "working" and whether the names in her phone were dates. She told him she was not a prostitute and that she was going to see her boyfriend. The officer informed her she had a warrant. He placed Terri G. in the backseat of the patrol car without handcuffing her, and he returned her purse to her before closing the door. She felt that something "was not right."

The officer told her she did not have to go to jail, despite her warrant. He asked her again if she was a prostitute, and she responded that living on the street she had done things to survive that she was not proud of and that she would not want to do again. He told her that she "knew what to do and to lay down." Not knowing what else to do, she complied. He began to drive; she was scared because he had a gun and she did not know what was going to happen. The car stopped in an alley, and defendant opened the car door and told her to get out. He instructed her to get down on her knees and to wipe off her lipstick. He exposed his penis, and she began to fellate him. The officer kept touching her back and head, complimenting her, and soliciting compliments from her. She repeated whatever he told her to say because she "just wanted to get out alive." Eventually, he told her to get up, remove her pants, and lie facedown in the backseat of the patrol car. She complied because she did not feel she had any other choice. He had intercourse with her, and then instructed her to get on her knees again, outside the car. He inserted his penis in her mouth, held her by the neck and mouth, and ejaculated. She wiped the ejaculate on her jacket. She did what he told her to do without objection because she was scared that he would hurt her. She was not thinking about going to jail for the warrant; she did not realize she was not going to jail until after he told her to get dressed, to "lay low," and that he would see her again.

She later talked to a friend, Kayla R., about the event. Based on their discussion about his physical description, she learned the officer was defendant. She reported the incident to another officer when she was arrested on the outstanding warrant about a week later. She identified defendant as the perpetrator in court and during an interview with detectives.

Defendant testified he encountered Terri G. one night as he was driving back to the police department. He asked if she had anything illegal on her person; she replied that she did not, but she was reaching into her pockets. She then consented to a search, which he conducted. Finding nothing, he let her go. Only later did he run a warrant check of her name. Defendant denied having any sexual contact with Terri G. and denied that she was in the backseat of his patrol car, despite the presence of her DNA.

The jury convicted defendant of kidnapping Terri G. to commit oral copulation, rape, or sexual penetration (count 1), committing oral copulation

against her will by threatening to use his authority as a public official (count 2), and of committing oral copulation against her will by means of duress (count 3). The jury also sustained the allegation that as to count 3, defendant had kidnapped the victim (enhancement 3a) and had committed the same crime against multiple victims.

*Anna B. (Counts 8–10)*

Anna B. is a heroin user and a self-professed "escort" who lives in Sacramento. In September 2012, she was in West Sacramento staying with a friend. In the middle of the night, she realized her cell phone battery was low and she did not have her phone charger with her. She walked from her motel room looking for somewhere to buy a charger. As she walked, a police officer in a patrol car (whom she identified at trial as defendant) pulled over, got out of the car, and began asking her questions. She explained she was trying to buy a cell phone charger and asked if he knew where she could purchase one. He indirectly asked whether she was prostituting, and she responded she was not. He asked her to get into the back of the patrol car so he could run her information. She asked if there was any way to avoid that. He responded she should get in for safety reasons, and that he would drive her to a store where she could purchase a charger. She got in and he shut the door.

He drove to another location, where he stopped and checked her information on the computer and with the dispatcher. It seemed to her that he was trying to find something to use as leverage against her, which made her nervous. At some point in their conversation, she volunteered that she was under the influence of heroin. He told her he could arrest her because she was under the influence. He insistently asked if she knew of any information to share with him, which made her feel she would have to divulge something to be set free. She began to panic; she tried to reason with him and when that did not work, she began pleading with him and crying. She felt helpless, trapped, and scared. She began to get angry and asked why he did not just take her to jail. She was scared and thought going to jail would be easier than dealing with him. He told her he could not let her go unless she gave him something. She offered to give him her phone number. He responded that he could take her somewhere more private. She told him she would rather not, and that she would rather be taken to jail or released. He repeated he would take her somewhere more private to discuss it. They drove somewhere dark and remote. While driving, he made comments that made her think he was trying to get her to solicit him or bribe him. He let her out of the car and implied he wanted sexual conduct from her; she was intimidated, and felt she had to comply with his orders. She did not necessarily think he would kill her, but she was frightened of more than just incarceration.

He lifted her onto the trunk of the car and made a comment about her breasts. When he was putting her back on the ground, she accidentally touched the button on the radio positioned on his shoulder, and he silenced her while he responded to someone asking if he was all right. He then placed her hand on his penis, and directed her to fellate him. She complied. For a short time, he handcuffed her because she said, "you are a police officer and you are making me do this, so you might as well put me in the handcuffs and . . . do it right . . . ." However, he removed them because she was having a difficult time fellating him. He also felt her breasts, and may have touched her vagina. Afterward, when she commented about him ejaculating in her mouth, he gave her a piece of gum. He drove her to a gas station, let her go, and said he would "give [her] a call." She went in, bought her cell phone charger, and walked back to her motel.

About a month later, in Sacramento, Anna B. was sleeping on the street with her boyfriend. A female police officer woke her up. Anna B. told her about the sexual encounter with defendant. The female officer had Anna B. speak to a sergeant and some detectives about the incident.

Defendant testified he met Anna B. when he saw a man walking down the street and Anna some distance behind him. When he approached, Anna B. walked toward his patrol car and said she was glad he stopped because the man was "creeping" her out. Defendant obtained Anna B.'s name and ran it through his system. He then got out of the car and talked to her; she did not appear to be intoxicated or under the influence at that time. As she was trying to find somewhere to buy a phone charger, he told her there was a store nearby that would probably have one and offered her a ride, which she accepted. She flirted with him while they drove, and he asked if she wanted to stop and talk. She agreed, so he parked and they talked for 10 to 15 minutes. She offered to give him her phone number, but another patrol car drove by, so defendant suggested they go somewhere more private. She assented, so he drove to an industrial area and got out of the car. He let her out and they began kissing. She said the situation was like a "fantasy." She accidentally hit the lapel microphone to his radio as he helped her off the trunk of the car, and he heard the dispatcher. She asked if he was going to handcuff and frisk her, so he handcuffed her behind her back and groped her breasts as she groped his groin (he was standing behind her). It seemed to him that she was trying to unzip his pants, so he unzipped them and she began to perform oral sex. She told him the handcuffs were uncomfortable, so he removed them and she completed the act. After talking some more he dropped her at a store so she could purchase her phone charger.

The jury convicted defendant of kidnapping Anna B. to commit oral copulation or sexual penetration (count 8), committing oral copulation against

her will by threatening to use his authority as a public official (count 9), and of committing oral copulation against her will by means of duress (count 10). The jury also sustained the allegation that as to count 10, defendant had kidnapped the victim (enhancement 10a) and had committed the same crime against multiple victims.

*Kayla R. (Counts 13, 15–16)*

Kayla R. was first approached by defendant, who was driving his patrol car, in October 2011 at about 3:00 or 4:00 a.m. while she was sitting at a bus stop in front of a bar. She was high at the time and had a pipe and methamphetamine in her purse. (She was also under the influence of methamphetamine when she testified at trial.) She consented to defendant's request to pat her down and search her purse. He found her pipe, handcuffed her, and placed her in the backseat of the patrol car. He left her there with the door closed while he spoke to other police officers. She was scared and thought she was going to jail. After the other officers left, defendant opened the door and asked why he should not take her to jail. He then repeatedly asked if she had something to offer him, left her in the backseat to think some more, and shut the door again.

When he returned, Kayla R. suggested sex. He did not respond, but shut the door, started to drive, and told her to duck down. He parked in an area near several industrial buildings. At the time she felt trapped and obligated to have sex with him, but did not mind because she did not want to go to jail. He removed her handcuffs, exposed his penis, and said it was his "first time doing . . . something like this," and she fellated him twice. They then had intercourse without a condom. He ejaculated, but told her she would not get pregnant because he had had a vasectomy, so she did not mind.

Afterward, he asked if she wanted to see him again, and she said yes and gave him her phone number. She thought he was nice and it made her feel special or important to be wanted by him. They met on perhaps a dozen occasions while defendant was on duty, and had sex nearly every time they met. On these subsequent occasions, she did not feel pressured to have sex because she was not trying to avoid jail. She does not feel that she was a victim; however, she did testify that she felt he was taking advantage of his position as an officer.

Defendant testified he met Kayla R. in late 2011 when he conducted a stop of two known probationers who were with her on the street at the time. When her name did not register any record in his warrant check, he challenged whether she was providing accurate information, and she told him her family lived nearby and could verify its accuracy. He drove her there, and denied

any sexual contact took place. A couple of weeks later, he saw her on the street wrapped in a blanket, so he stopped to speak with her. She sat in the back of the patrol car, with the door open, while they talked because it was cold. During that encounter, he found a methamphetamine pipe on her, so he counseled her about the dangers of drugs. After they talked, he drove her to her friend's house. She gave him her phone number and told him to "call her sometime." He denied there was any sexual contact on that occasion. Their third encounter was initiated by his phone call to her, which resulted in a consensual oral copulation. They continued to meet for approximately eight months, always while he was on duty, and mostly involving an act of oral copulation. He stopped calling her when it became apparent she was telling others about their relationship, she started asking to see him when he was not working, and she started asking him to rent a room for her. He denied arresting her, denied that she pleaded with him to not take her to jail, and denied asking what she could give him so that he would not take her to jail.

The jury convicted defendant of kidnapping Kayla R. to commit oral copulation, rape, or sexual penetration (count 13), committing oral copulation against her will by threatening to use his authority as a public official (count 15), and of committing rape against her will by threatening to use his authority as a public official (count 16).

*Karen N. (Counts 19–24)*

Karen N. testified that she had four interactions with defendant. On the first occasion, in either December 2011 or January 2012, defendant and another officer responded to a call about her disruptive behavior at her friend's apartment. She was intoxicated, screaming, and hitting the walls. Karen N. left the apartment voluntarily, and the friend gave defendant Karen's hat to return to her. After she left the apartment, either with defendant or on her own, Karen N. found herself in an unknown location, possibly handcuffed, in the back of a patrol car with defendant directing her to crawl out of the backseat, get on her knees, close her eyes, and turn around. When she complied, she found she was facing the officer's exposed penis. Finding herself "caught between a rock and a hard place," not wanting him to kill or to hurt her and wanting to be set free, she performed oral copulation on the officer. Afterwards, as she stood up and looked at his name tag, he said to her, "now everything Mr. Alvarez does is a secret."

A few months later, when she was almost at her door after a night of recycling, she heard a car approach her from behind. She ran into her motel room, but before she could close the door, defendant entered and followed her into her bathroom. He ordered her onto her knees, unzipped his pants, asked if she "want[ed] to do something," and then forced her to fellate him. She was frightened. When he was finished, he left.

On the third occasion, Karen N. had just forced her boyfriend to leave her motel room when defendant knocked on the door. Though she sat in her room with the lights off without making any noise, defendant kept knocking on the door. She was nervous. Defendant said, "Karen, if you don't open the door, I have to go get a key and open it." Realizing he was not going to leave, she opened the door. He came into the room, closed her window, asked her if she "wanted to do something," exposed his penis, and directed her to get on her knees. She became ill and vomited in the garbage can, but he did not care. She did not want to have sex with defendant but, to make him leave, she orally copulated him, and briefly had intercourse with him.

Their fourth interaction occurred when he approached her in his patrol car around 2:00 or 3:00 a.m. as she was walking out of a motel. On this occasion, she was "a little bit high" on methamphetamine. He asked if she wanted a ride. She asked if he was going to drive her home and got in the backseat of the car. Instead of taking her home, he drove to a nearby alley. He looked at her, told her they could not have sex, though she had not asked him to have sex with her, asked her if she "want[ed] to do something," unzipped his pants, and directed her to get on her knees. In an attempt to make it easier for herself, she "played with him . . . and started kissing him and told him he was cute." Not knowing what else she could do, she complied and orally copulated him for "a second," and then she got up and ran away.

Defendant testified he first met Karen N. long ago when he arrested her on a domestic violence charge or warrant. He did recall escorting her from her friend's apartment one night when she was intoxicated and causing a disturbance. The friend found a hat belonging to Karen N. after she had left, and defendant agreed to take it to her. He found her walking nearby, returned her hat to her, and offered her a ride. Not handcuffed, she got into the backseat and told defendant her friend was upset with her because she "would not give it up to him." But, she implied she would engage in sexual conduct with defendant. He asked if she wanted to go somewhere to talk about it more, and she said she did. He drove to a vacant area, parked, and let her out of the car. She began to undress. Defendant told her he did not want that, but asked if she would give him oral sex. She fellated him. About a month later, he saw Karen N. walk past his parked patrol car. He greeted her and asked "if she remembered what happened last time." She responded that she did, that "it was kind of crazy, but she liked it." He asked if she would be willing to do it again. She assented, and he unlocked the door so she could get into the backseat. They drove to an alley, where he let her out of the car and she performed oral sex. They had another sexual encounter at her motel after she waved him over when he was patrolling the area. He entered her room, and she showed him lingerie she had hanging in her closet. He asked if there was something she "wanted to do." She said "yeah," and she fellated and had intercourse with him. He recorded this encounter on a camera he

carried on his person. She was intoxicated during each of these encounters. He denied that the fourth incident Karen N. recounted ever took place, and denied he had any sexual contact with her in her bathroom.

The jury convicted defendant of committing oral copulation against the will of Karen N. by means of duress on four separate occasions (counts 19, 20, 22 and 24), of raping her by means of duress (count 21), and of kidnapping her to commit oral copulation (count 23). The jury also sustained the allegations that, as to count 24, he had kidnapped the victim (enhancement 24a), as to counts 20, 21 and 22, defendant had committed the acts of oral copulation and rape during the course of a residential burglary (enhancements 20a, 21a, 22a), and as to counts 19, 20, 22, and 24, he had committed the same crime against multiple victims.[1]

*Rochelle G. (Counts 25–27)*

In late September 2012, Rochelle G. was approached by an officer in a patrol car at approximately 4:00 a.m. while she was walking in a shopping center parking lot. (In subsequent questioning with detectives, she identified defendant as the officer in a photographic lineup and recalled that his name began with the letter A.) Defendant, who was in uniform and wearing his gun, got out of the patrol car, shone the car's spotlight on Rochelle G., and asked her why she was on the street at that time of night. Rochelle G. informed him that she was going to use the pay phone by the grocery store located in that shopping center to call a friend. He asked if she was prostituting. After conducting a field sobriety test, defendant stated that it appeared Rochelle G. was under the influence, which she denied. He searched her, feeling inside her bra and patting her vaginal area and buttocks while she had her hands behind her head. He then placed her in the back of the patrol car and closed the door, without handcuffing her. Rochelle G. felt very uncomfortable, nervous, scared, and "stuck." Defendant ran Rochelle G.'s name through the computer in the car to check for outstanding warrants and an arrest record. He then told her she was under arrest for being under the influence of a controlled substance.

He asked her what she could do for him to let her go. She said she would not "snitch" on anyone or provide any information but promised he would not see her on the streets again at that time of night. He responded that was

---

[1] The jury did not make any finding as to the multiple victim enhancement (Pen. Code, § 667.61, subd. (e)(4); undesignated statutory references are to this code) alleged in association with count 21 and informed the court as such when the verdicts were read; however, the trial court did not address this enhancement in its declaration of a mistrial as to certain counts and enhancements. At the People's request, we exercise our authority pursuant to section 1260 to dismiss the multiple victim enhancement to count 21.

not what he wanted. She told him she would not proposition him because it was illegal and he was a police officer. He told her it was only illegal if she "g[o]t paid for it." She asked him to drop her at a relative's house, which he declined, stating he was "not a taxi service." They remained parked at the shopping center for a while, until she finally agreed to fellate him so that she could be released. She felt she "had to do it" because she was in the back of the patrol car and it appeared to be "the only thing that [she] could do to not go to jail."

He drove her to an alley off a nearby street, obtained her assurance that this would remain between them, and then stopped the car. He opened the back door, directed her to remain seated but to move her feet out of the car and to wipe off her lipstick. He moved closer, sought further reassurance the encounter would stay between them, unzipped his pants, and exposed his penis. Defendant said something akin to "you know you want to," to which she replied, "I don't want to." Rochelle G. was feeling "real uncomfortable," and she "wanted to run," but she knew if she did, he would take her to jail, so she proceeded to fellate him. While she was performing the oral copulation, he alternately placed his hands inside her bra and used his hands to move her head back and forth. He asked if she liked it, and she responded negatively. He ejaculated in her mouth, zipped up his pants, sought further reassurances of her confidentiality, and then he left her in the alley.

Defendant testified he did not recognize Rochelle G. and did not recall any contact with her. Additionally, he denied having any sexual contact with Rochelle G.

The jury convicted defendant of kidnapping Rochelle G. to commit oral copulation (count 25), committing oral copulation against her will by threatening to use his authority as a public official (count 26), and of committing oral copulation against her will by means of duress (count 27). The jury also sustained the allegations that as to count 27, defendant had kidnapped the victim (enhancement 27a) and had committed the same crime against multiple victims.

*Sentencing*

The trial court sentenced defendant to an aggregate state prison term of 205 years to life. It imposed consecutive 25-year-to-life sentences for counts 3, 10, 20, 21, 22,[2] 24, and 27, a consecutive 15-year-to-life sentence for count 19, consecutive seven-year-to-life sentences for counts 1, 8, 13, 23, and 25

---

[2] The indeterminate abstract of judgment does not list the conviction for count 22 at item 1. On remand we will direct the trial court to correct the abstract by including defendant's conviction for oral copulation by duress (count 22).

(with the terms for counts 1, 8, 23, and 25 stayed pursuant to § 654), consecutive six-year determinate sentences for counts 2, 9, 15, and 26 (with the terms for counts 2, 9, and 26 stayed pursuant to § 654), and a consecutive two-year determinate sentence (one-third the middle term) for count 16.

## DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 1.0 *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 1.1 *Aggravated Kidnapping and Kidnapping Enhancements*

Defendant contends there is insufficient evidence to support a finding that he kidnapped the victims, for purposes of either the aggravated kidnapping convictions or the kidnapping sentencing enhancements, because in each instance either (1) the victim consented to the movement, even if that consent was obtained by fraud or deceit, or (2) the victim was under lawful arrest at the time of the movement. We conclude substantial evidence supports the kidnapping conviction and enhancement as to some victims but not as to others.

■ To be convicted of aggravated kidnapping, as defendant was in counts 1, 8, 13, 23, and 25, he must have "kidnap[ped] or carrie[d] away" another to commit rape, oral copulation, or any other specified offense, where "the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(1), (2).) Similarly, the kidnapping sentencing enhancement for counts 3 and 10 require that in the commission of rape or oral copulation by means of duress, among other enumerated crimes, "[t]he defendant kidnapped the victim . . . and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense . . . ." (§ 667.61, subd. (d)(2); see *id.*, subd. (c)(1) & (7).) Thus, unsurprisingly, both the aggravated kidnapping convictions and the kidnapping sentencing enhancements require the jury to find that defendant kidnapped the victims.

■ As pertinent here, section 207, subdivision (a) defines "kidnapping" as "forcibly, or by any other means of instilling fear, steal[ing] or tak[ing], or

---

*See footnote, *ante*, page 989.

hold[ing], detain[ing], or arrest[ing] any person in this state, and carr[ying] the person into another country, state, or county, or into another part of the same county . . . ." Thus, kidnapping requires the asportation of the victim accomplished by force or instilling fear. (*People v. Majors* (2004) 33 Cal.4th 321, 326 [14 Cal.Rptr.3d 870, 92 P.3d 360] (*Majors*).) This does not require physical compulsion. (*Id.* at pp. 326–327.) Rather, where the victim reasonably feels compelled under the circumstances to comply with the defendant's orders under fear of harm or injury from the defendant, the asportation is forcible. (*Id.* at p. 327.) Moreover, asportation accomplished by threat of arrest "carries with it the threat that one's compliance, if not otherwise forthcoming, will be physically forced." (*Id.* at p. 331.) Thus, the threat of arrest carries with it an implicit use of force necessary for a kidnapping conviction. (*Ibid.*) In contrast, where the perpetrator tricks the victim into the asportation by fraud, deceit, enticement, or false promises, without application of the requisite force or fear, there is no kidnapping. (*Id.* at pp. 327–328.)

Additionally, where a victim consents to the movement, meaning he or she exercises his or her free will in the absence of threats, force, or duress, there is no kidnapping. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 476–477 [174 Cal.Rptr.3d 1, 328 P.3d 1] (*Sattiewhite*).) However, even where a victim's initial cooperation is obtained without force or fear, a kidnapping occurs if the accused subsequently compels the victim to accompany him. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017 [81 Cal.Rptr.3d 299, 189 P.3d 300] [where victim voluntarily accepted ride with the defendant, that voluntariness is vitiated when the defendant does not let the victim out of the car]; accord, *People v. Thompson* (1967) 252 Cal.App.2d 76, 88 [60 Cal.Rptr. 203] [movement is not consensual where victim agrees to follow robber upstairs, stops midway up the stairs to look at relatives below, and continues only after robber waves gun and says, " 'Come on, come on' "].)

 Further, the criminal kidnapping statute does not apply "[t]o any person acting under Section 834," which defines a lawful "arrest" as "taking a person into custody, in a case and in the manner authorized by law." (§§ 207, subd. (f)(2), 834.) An arrest requires " '(1) taking a person into custody; [and] (2) actual restraint of the person or his [or her] submission to custody.' " (*People v. Boren* (1987) 188 Cal.App.3d 1171, 1177 [233 Cal.Rptr. 859].) An officer may arrest a person if that person has an outstanding warrant or, in the absence of a warrant, where the person to be arrested has committed a public offense in the officer's presence, or the officer has probable cause to believe the person to be arrested has committed a felony. (§ 836, subd. (a)(1), (3).) Whether an officer has probable cause to effectuate an arrest is an objective standard, and the " 'secret intentions, hopes, or purposes' " of the arresting officer are not relevant to the legality of the arrest. (*Levin v. United Air Lines, Inc.* (2008) 158 Cal.App.4th 1002, 1018 [70

Cal.Rptr.3d 535]; see *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1266–1267 [62 Cal.Rptr.2d 345] [the arresting officer's ulterior motives do not invalidate behavior that is otherwise objectively reasonable pursuant to the 4th Amend.].) Additionally, "probable cause is not vitiated and an arrest remains valid even if the officer purports to arrest the person for the wrong crime." (*Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 452 [15 Cal.Rptr.3d 507].)

■ Again, section 207, subdivision (f)(2) provides for the application of the lawful arrest defense to a "person *acting under* Section 834 [defining a legal arrest]." (Italics added.) Based on the plain language of the statute, once a person is no longer *acting* to effectuate a legal arrest, the protection from criminal liability otherwise afforded is lost. Just as the defense afforded by a victim's initial consent may be vitiated by a subsequent withdrawal of that consent (*People v. Hovarter, supra*, 44 Cal.4th at pp. 1017–1018), we conclude that changing circumstances may limit a defendant's ability to rely on a lawful arrest as a defense to a kidnapping charge. Thus, while an officer is transporting someone pursuant to a lawful arrest, he is not kidnapping the arrested person; however, once the transportation is no longer for lawful law enforcement objectives, it may transmute into a kidnapping.[3]

### 1.1.1 *Terri G. (Count 1 and Enhancement 3a)*

Defendant contends his conviction for the aggravated kidnapping of Terri G. (count 1) and the kidnapping enhancement applied to his conviction for oral copulation by means of duress (enhancement 3a) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car. We disagree.

---

[3] We are not persuaded by defendant's assertion that he is immunized from prosecution for kidnapping or any lesser included offense based on his lawful arrest of the victims pursuant to section 847. Section 847 applies as a bar to *civil* liability. (§ 847, subd. (b).) The inclusion of the phrase "cause of action" in this section does not, contrary to defendant's argument, make that statute applicable to criminal liability. Each of the examples proffered by defendant as authority for the phrase "cause of action" denoting criminal counts is inapposite. Penal Code section 298, subdivision (c)(2), Health and Safety Code section 25984, subdivision (b)(1), Government Code section 8655.5, subdivision (c)(1), and Business and Professions Code section 11021 all specifically provide a "civil *or criminal*" (italics added) modifier to the term "cause of action" to indicate that a criminal claim is effected. Section 847 does not include any such modifier. Instead, it states, "[t]here shall be no civil liability . . . and no cause of action shall arise . . . ." (§ 847, subd. (b).) Additionally the two criminal cases cited by defendant wherein a cause of action is mentioned involve a discussion of the general concepts of res judicata and collateral estoppel; they do not involve an interpretation of section 847. (See *People v. Sims* (1982) 32 Cal.3d 468, 477, fn. 6 [186 Cal.Rptr. 77, 651 P.2d 321]; see also *People v. Damon* (1996) 51 Cal.App.4th 958, 968 [59 Cal.Rptr.2d 504].) Indeed, defendant has not cited any cases, nor have we found any, in which section 847 has applied to immunize a peace officer from criminal liability.

To convict defendant of kidnapping, the jury had to necessarily reject defendant's testimony that Terri G. was not in his patrol car. Thus, it must have at least partially accepted Terri G.'s testimony, which was that by the time defendant restrained Terri G. by placing her in the backseat of the patrol car and closing the door, he knew she had an outstanding warrant. That would provide defendant probable cause to arrest her. (See § 836, subd. (a) ["A peace officer may arrest a person in obedience to a warrant . . . ."].) Thus, this would appear to be a case in which an arrest was authorized by the law. Additionally, despite the fact defendant returned Terri G.'s purse to her and did not handcuff her, there is nothing about the manner in which defendant effected the arrest that violates constitutional norms. However, after arresting Terri G., defendant told her she did not have to go to jail despite her warrant, pointedly asked if she was a prostitute, and when she responded that she had done things of which she was not proud and would not want to do again, he told her she "knew what to do and to lay down." She was frightened and did not know what else to do, so she complied. He drove the car to an alley, where he opened the car door and directed her to perform oral sex. At the point at which defendant began to offer an alternative to jail while driving the patrol car, he was not "acting under" a lawful arrest but to pursue his own prurient interests. Accordingly, there is substantial evidence to support a finding that the lawful arrest defense did not apply to absolve defendant of criminal liability.

### 1.1.2 *Anna B. (Count 8 and Enhancement 10a)*

Defendant contends his conviction for the aggravated kidnapping of Anna B. (count 8) and the kidnapping enhancement applied to his conviction for oral copulation by means of duress (enhancement 10a) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car and she consented to being transported in the car, even if the asportation was by fraud or deceit. We disagree.

According to both Anna B.'s and defendant's testimony, Anna B. entered the rear seat of defendant's patrol car voluntarily based on his promise that he would take her to a store to purchase a cell phone charger. Thus, Anna B.'s initial consent appears to have been voluntarily given, without the threat of arrest, even if it was premised on a fraudulent promise by defendant. However, she further testified that they drove to a second location, where he stopped the car to run her information, seemingly to find something to use as leverage against her. At that point, she began to plead with him to let her go and cried. He refused to release her. Instead he drove to a third and more remote location, where he directed her to perform oral sex. By then her consent had been vitiated by defendant's refusal to release her at the second location. Thus, there is substantial evidence to support the jury's finding that Anna B. did not consent to the movement.

At some point during their conversation at the second location, Anna B. divulged to defendant that she was under the influence of heroin. However, defendant testified that when he *first* encountered Anna B. she did not appear to be intoxicated or under the influence of any narcotic. Because being under the influence of the narcotic, as opposed to its possession, is only a misdemeanor offense, defendant lacked probable cause to arrest Anna B. unless she committed that offense in his presence. (Pen. Code, § 836; Health & Saf. Code, § 11550.) However, even assuming defendant did lawfully arrest Anna B., there is substantial evidence to support a finding that the lawful arrest defense did not apply where defendant transported Anna B. from the second location to an isolated area so they could talk in private despite her request to be taken to jail, where he made comments to induce her to solicit him while driving, and where, on arriving at the final location, he implied he wanted sexual contact with her. During the course of this asportation, there is substantial evidence to support a finding that even if defendant had lawfully arrested Anna B. at one time, he was no longer "acting under" that arrest when he drove her to an isolated area so that she could satisfy his prurient interests. Therefore, neither count 8 nor enhancement 10a are to be reversed for want of evidence.

### 1.1.3 *Kayla R. (Count 13)*

Defendant contends his conviction for the aggravated kidnapping of Kayla R. (count 13) must be reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car and she consented to being transported in the car. We disagree.

According to Kayla R.'s testimony, she did not enter the patrol car until after defendant had patted her down, found a methamphetamine pipe in her possession, placed her in handcuffs, and directed her to sit in the backseat. She was, therefore, subject to a lawful arrest when she entered defendant's patrol car. Nonetheless, after other officers left the scene, defendant opened the door, asked Kayla R. why he should not take her to jail, and prodded her to offer him something, leaving her in the locked rear compartment to "think." Thereafter, once she offered him sex, he told her to duck down and he drove her to an area near some industrial buildings, where she orally copulated him. This is substantial evidence to support a finding that during his transportation of Kayla R., defendant was no longer "acting under" a lawful arrest and is not entitled to the protection of that defense.

According to defendant, Kayla R.'s testimony shows she made the voluntary decision to go with defendant to have sex rather than go to jail. Kayla R. did testify that she offered to have sex with defendant, that defendant then began driving, and while they drove defendant and Kayla R. talked about

what would be "a good place to go to do that." Defendant argues this is evidence of positive cooperation in act or attitude pursuant to an exercise of free will, thereby constituting consent. (See *Sattiewhite, supra,* 59 Cal.4th at pp. 476–477.) Were we to look at that evidence alone, we might agree with defendant's assessment.

 However, Kayla R. also testified that defendant had handcuffed her, placed her in the backseat of the patrol car, and left her there while he spoke with other officers. After the other officers left, he asked why he should not take her to jail and what she had to offer him. When she refused to provide him any information, he shut the door again, and left her to think. For purposes of kidnapping, one has not consented unless acting "freely and voluntarily and not under the influence of threats, force or duress." (*People v. Davis* (1995) 10 Cal.4th 463, 517 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Thus, "the concepts of consent and force or fear with regard to kidnapping are inextricably intertwined." (*Majors, supra,* 33 Cal.4th at p. 331.) Therefore, where there is a threat of arrest, there is also an implied threat that a failure to comply will result in the application of physical force, thereby undermining the victim's free will in any assessment of consent. (*Ibid.*) Here, Kayla R. was under arrest at the time she purportedly consented to go with defendant, already handcuffed and sitting in the rear seat of his patrol car. Therefore, there is substantial evidence to support a finding that she did not consent to go with defendant.[4]

### 1.1.4 *Karen N. (Count 23)*[5]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 1.1.5 *Rochelle G. (Count 25)*[7]

Defendant contends his conviction for the aggravated kidnapping of Rochelle G. (count 25) and the kidnapping enhancement applied to his conviction for oral copulation by means of duress (enhancement 27a) must be

---

[4] For the same reasons, we do not find any error in the trial court's denial of defendant's motion for acquittal as to count 13. (See *People v. Stevens* (2007) 41 Cal.4th 182, 200 [59 Cal.Rptr.3d 196, 158 P.3d 763].)

[5] In light of our conclusion in the unpublished portion of the opinion that insufficient evidence supports defendant's conviction for oral copulation by means of duress in count 24, we do not address his contention that insufficient evidence supports the sentencing enhancement in count 24a. (See § 667.61, subd. (a).)

*See footnote, *ante,* page 989.

[7] In the unpublished portion of the opinion, we conclude there is insufficient evidence to support defendant's conviction for oral copulation by means of duress in count 27. Therefore, we do not address the sufficiency of the evidence to support enhancement 27a, because it cannot stand in the absence of an associated conviction. (See § 667.61, subd. (a).)

reversed because she was subject to a lawful arrest when she was transported in defendant's patrol car and she consented to being transported in the patrol car. We disagree.

■ As noted above, an arrest is not lawful where it is not conducted in a manner authorized by law. (§ 836.) Here, in searching Rochelle G. following her field sobriety test, defendant felt her breasts inside her bra and patted her vaginal area and buttocks, making Rochelle G. feel very uncomfortable. Defendant was authorized only to conduct a search incident to arrest, which, subject to limitations, authorizes an officer "to search an arrestee's person, personal property, or vehicle for evidence of crime in order to prevent its concealment or destruction" (*People v. Tom* (2014) 59 Cal.4th 1210, 1247 [176 Cal.Rptr.3d 148, 331 P.3d 303]) or to protect officer safety where there is reason to believe the suspect is armed (see *Riley v. California* (2014) 573 U.S. ___, ___ [189 L.Ed.2d 430, 440, 134 S.Ct. 2473]). Here, there was nothing to indicate Rochelle G., whom defendant arrested for being under the influence of a narcotic, was armed or that she would be able to conceal or destroy evidence of her crime with anything inside her bra, vagina, or buttocks. Therefore, defendant's search of Rochelle G. was unreasonable and her arrest was not conducted in a manner authorized by law. Accordingly, there is substantial evidence to support a finding that the lawful arrest defense did not apply.

Rochelle G. testified she did not enter defendant's car until after he directed her to do so (after he shone a spotlight on her, accused her of prostituting, conducted field sobriety tests, accused her of being under the influence of drugs, and improperly searched her). This is substantial evidence to support the jury's finding that Rochelle G. did not enter the car consensually. (*Majors, supra*, 33 Cal.4th at p. 331.) Thereafter, while she remained locked in the rear compartment of the patrol car, defendant refused her request to take her to her relative's house and refused to release her on her promise not to be on the streets at that time of night again. Based on the circumstances and the victim's custodial status, it would be reasonable for a jury to conclude that Rochelle G. did not consent to the movement, despite agreement to orally copulate defendant, because she could not leave and defendant had already demonstrated that he would not release her or take her where she wanted to go. (See *Sattiewhite, supra*, 59 Cal.4th at pp. 476–477 [consent requires "an exercise of 'a free will' " and "that the consenting person . . . 'act[s] freely and voluntarily and not under the influence of threats, force, or duress' "].) Therefore, there is substantial evidence to support the finding that Rochelle G. did not consent to the movement.

1.2–3.2*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed as to counts 3, 19, 23, 24, and 27. The multiple victim enhancement alleged in association with count 21 (§ 667.61, subd. (e)(4)) is dismissed. Defendant's sentence on counts 1, 8, 13, and 25, is modified to life with the possibility of parole as to each count. Execution of defendant's sentence on counts 15 and 16 is stayed. We lift the stay of execution of sentence as to count 25. As modified, the judgment is affirmed. The matter is remanded to the trial court for retrial on count 3 and any applicable enhancements only. If the People elect to retry defendant as to count 3, the trial court shall resentence defendant following retrial. If, within 60 days after the remittitur issues from this court, the People have not filed and served an election to retry count 3, the trial court shall dismiss said count, and shall resentence defendant as necessary. The clerk of the trial court shall correct the indeterminate abstract of judgment to include defendant's conviction for count 22 (oral copulation by duress—§ 288a, subd. (c)(2)(A)) in item 1 of that abstract. We further direct the clerk of the trial court to prepare an amended abstract of judgment not inconsistent with the holdings expressed herein, and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

Nicholson, Acting P. J., and Mauro, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 2016, S234977.

---

*See footnote, *ante*, page 989.