Filed 11/30/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060049 |
| v. | (Super. Ct. No. B1366626) |
| RODNEY TAUREAN LEWIS, | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is ordered that the opinion filed on November 29, 2021, be modified in the following particulars:

1. On page 2 of the majority opinion, FACTS section, first paragraph, the first sentence is deleted and replaced with the following:

"After a romantic dinner at home, Suzanne Doe (Doe)[1] went to a bar with her boyfriend, D. Lopez."

---

[1] The record does not reveal the victim's full name. Before trial, the parties agreed to refer to her as Suzanne Doe, or Doe. Because the parties below, and on appeal, refer to her as Suzanne Doe, we will continue to do so.

1

2.  On page 1 of the concurrence and dissent, FACTS section, first paragraph, the second sentence, remove "Diego" and replace with "D.".

3.  On page 10, footnote 7 of the concurrence and dissent, replace "CALJIC" with "CALCRIM".

4.  On page 18 of the concurrence and dissent, replace "CALJIC" with "CALCRIM".

This modification does not effect a change in judgment.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


GOETHALS, J.

Filed 11/29/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060049 |
| v. | (Super. Ct. No. B1366626) |
| RODNEY TAUREAN LEWIS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Vincent J. Chiarello, Judge.  Affirmed in part and reversed in part.

Swanson & McNamara, Edward W. Swanson and August Gugelmann for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Alice B. Lustre and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

1

Rodney Taurean Lewis appeals from a judgment after a jury convicted him of rape by intoxication and kidnapping to commit rape. Lewis argues the trial court erred in instructing the jury on kidnapping to commit rape and insufficient evidence supports his convictions. We agree there was prejudicial instructional error and reverse his kidnapping to commit rape conviction. Because there was insufficient evidence to support that conviction, Lewis may not be retried. His insufficiency of the evidence claim as to his rape by intoxication conviction is meritless. In all other respects, we affirm the judgment.

At the outset, we note this case is heartbreaking. The victim began the evening celebrating her relationship with her new boyfriend but ended the evening as the victim of a violent sexual assault. Despite our empathy for the victim, we are constrained by the law and conclude the conviction for aggravated kidnapping cannot stand.

## FACTS

After a romantic dinner at home, S. Doe (Doe) went to a bar with her boyfriend, D. Lopez. At the bar, Doe first lost her cell phone, and after meeting Lewis, lost her memory before leaving the bar with Lewis. The next morning, Doe was found in a park, unconscious and wrapped in a sheet; she had been sexually assaulted. After a two-year investigation that included reviewing the bar's video surveillance and cell phone records, officers arrested Lewis.

An amended information charged Lewis with rape by an intoxicating substance (Pen. Code, § 261, subd. (a)(3), all further statutory references are to the Penal Code) (count 1), and kidnapping to commit rape (§ 209, subd. (b)(1)) (count 2). Lewis's first trial resulted in a mistrial when the jury could not reach a verdict. At his second trial, the parties offered the following evidence.

2

*I. Prosecution Evidence*

In August 2011, 22-year-old Doe was near the end of her summer au pair job and would soon return home to Ireland to finish her college degree. She and Lopez had just started dating. Her host family was on vacation, and she had the weekend off. She invited Lopez over for dinner. Lopez brought a bottle of wine, and they drank it with dinner. Doe wanted to stay home and spend the evening with Lopez.[2]

Instead, Lopez took Doe via taxi to Rudy's Pub, a Palo Alto college bar, arriving about 11:00 p.m. Doe did not feel intoxicated. Lopez bought Doe an alcoholic drink that she drank about one-third of because it was too strong—it had about four shots of alcohol. Doe, who felt tipsy, danced with Lopez. When Lopez went to the restroom, Doe went to get her cell phone from her purse, but it was gone. She panicked as she searched for her phone because it belonged to her host family.

Lewis approached and asked Doe what she was looking for. After Doe told him, Lewis said his friend found a phone. Lewis said he would call his friend, who had left Rudy's, and he placed his phone to his ear. Lewis suggested they have a drink while they waited for his friend to return to Rudy's, which was very loud. Doe stated, "From this point on, I don't really remember clearly." Although Doe took Zoloft once a day, she did not take Xanax. She did not intend to leave Rudy's with anyone but Lopez.

Although Doe did not remember what happened, Rudy's video surveillance, which was played for the jury, and bartender Erica Weston's, Lewis's, and Lopez's testimony helped explain what happened in Rudy's. The video surveillance focuses the viewer looking down on the bar and out at the dance floor.

_____

[2] At the time of the second trial, Doe and Lopez had been married for almost three years.

3

The video fails to show the first contact between Doe and Lewis.  They first appear in the video on the right side of the screen on the side of the bar.  Lewis and Doe reached the bar at 12:37 a.m.  Lewis ordered two Long Island iced teas and one shot of tequila.  Lewis pulled out his phone and held it to his ear.  Lopez approached the bar, stood behind Lewis and Doe, and talked with other patrons.  At the same time, Doe kissed Lewis and held his hand.  Their flirtation appeared to be reciprocal.

When the drinks arrived, Lewis slid one of the Long Island Iced Teas and the tequila shot to Doe.  She drank the shot and sipped the mixed drink.  As they drank and talked, Lopez danced nearby with some other women.

Minutes later, Lewis ordered two shots of tequila.  Weston had training and experience recognizing the physical signs of intoxication and noticed Doe "swerving" and "leaning on the bar."  Although Doe did not look "completely out of control," Weston believed she was unaware how impaired she was and feared she or someone else might get hurt.  Weston told Lewis that she was not going to serve Doe more alcohol.  Lewis angrily threatened to get her fired, and then said the drinks were for another friend.  Weston poured two shots of tequila and set them on the bar.

Around this time, Lopez tapped Doe on the shoulder.  She turned around to talk to him and handed him the Long Island iced tea.  Lopez was intoxicated but he believed Doe was not so intoxicated she could not walk or speak.  While Lopez and Doe were talking, Lewis turned and spoke to Lopez briefly.  After Lewis turned back toward the bar and paid for the drinks, he positioned himself between Lopez and Doe, who also turned toward the bar.  Weston slid the shots toward Lewis.

There are portions of the video where the screen goes dark.  This is one of those times.[3]

---

[3]  Lewis testified the lights did not go off.  Rudy's owner speculated the nearby strobe light interfered with the video camera.

When the video returns and the patrons reappear, Weston turned away to serve other customers, and Doe and Lewis drank their shots. Lewis took Doe's hand, put his arm around her back, and began to usher her away from the bar. Doe placed her arm around his back momentarily. Lewis leaned toward Lopez, Lewis freed his arm from Doe's back, and the two men spoke. Doe turned slightly toward the bar and leaned on it. Lewis again took Doe's hand, put his arm around her back, and began to usher her away from the bar. Doe stepped free from Lewis and walked ahead of Lewis across the dance floor through the crowd. Lewis followed. As they walked by and away from him, Lopez talked with a male patron. Lopez tried following them, but the bar was so crowded he was unable to do so. As Doe and Lewis left Rudy's around 12:45 or 12:46 a.m., Lopez is seen inside dancing.

The next morning, a woman found Doe, unconscious and wrapped in a blanket, lying on a plant median in a park parking lot. When the woman could not get Doe to respond, she called 911.

Paramedic Maxwell Magnus arrived at the park and found Doe unconscious. Magnus pulled the blanket back and saw Doe's underpants were "partly pulled down" and her dress was "up to about her belly button." When Magnus asked how much she had to drink, Doe detailed being at Rudy's, having a glass of wine, losing her cell phone, and a man telling her that he knew where her phone was. However, she could not say how the evening ended. Although Doe initially said she did not want to go to the hospital, she eventually agreed.

Officer Sean Downey arrived. Doe was unresponsive and dazed, and her eyes were "glassy." He went to the hospital to speak with Doe. At the hospital, a sexual assault response team (SART) nurse (Nurse) examined Doe and took blood and urine samples. Doe told the Nurse that she lost her memory and thought she had sex because it "hurt[] inside [her] vagina." Doe had bruises on her arms and legs, and abrasions on her lower back and feet. She had redness and swelling in her labia minora, and a laceration

5

to her posterior fourchette. The Nurse concluded Doe's injuries were consistent with her belief she had sex.

Downey noticed Doe became more lucid and responsive during the SART exam. As her condition improved, Doe remembered more of the previous night. She told Downey she had dinner with her boyfriend, drank two glasses of wine, and went to a bar with her boyfriend. At the bar, she got separated from her boyfriend, she lost her cell phone, a man told her that his friend had her phone, and the man appeared to make a call. The man suggested they have a drink before they got her phone, which she did. She told Downey "she [didn't] have much memory after she left the bar." Downey believed Doe was under the influence of alcohol and a drug.

Doe's urine contained alprazolam, i.e., Xanax, an oral depressant used to treat anxiety that can cause fogginess or memory problems. An expert testified its effects are "enhanced" if it is combined with alcohol. He said alprazolam's effects typically take about 30 minutes to appear but when combined with alcohol it could be quicker and its effects are "enhanced."

A sample of Doe's blood taken around 11:00 a.m. had a blood alcohol concentration (BAC) of 0.18. Another expert estimated Doe's BAC at 1:45 a.m. was 0.35, and within a range of 0.32 to 0.41. That level of intoxication was considered Phase IV, where a person could pass out. On cross-examination, Lewis's trial counsel presented the expert with a hypothetical using Doe's weight and the amount of alcohol he estimated she consumed. The expert opined that at 1:45 a.m. the person's BAC would be about .13. The expert agreed mixing alcohol with alprazolam had an enhanced effect.

Detective Anjanette Holler led the investigation. Holler traced Doe's cell phone to near Rudy's. She went to Rudy's and met with the owner, who gave her the phone, surveillance video, and credit card receipts that led her to Lewis.

6

Police officers went to Lopez's house and spoke to him. Lopez said they had dinner, shared a bottle of wine, and went to Rudy's about 11:15 p.m. He bought two "Adios Mother Fuckers" drinks, but Doe drank only one-third of hers. They danced, she lost her cell phone, and they looked for it. Lopez went to the restroom, and when he returned, Lopez found her at the bar with another man. Lopez spoke to Doe and the man, but he could not remember what was said. At some point, he realized Doe was gone, and he looked for her. Lopez was taken aback because he expected to spend the night with Doe. He took a taxi to Doe's house and slept in his car. He drove home around 7:30 a.m., about an hour before police arrived to speak with him.

Holler learned where Lewis lived in San Mateo and she spoke with him five days after the incident.[4] Lewis stated he met Doe when she asked him if he found her cell phone. He told her "he thought maybe he knew somebody that may have found a phone." While standing at the bar, he realized she was "pretty drunk." He left with her because he thought he could help her find her phone. In the parking lot, Doe asked and he agreed to drive her home. On the way to her home, she would "pass out" intermittently and at one point "start[ed] freaking out" and asked to get out of the car. He exited the highway and dropped her off at an apartment complex near a park. Doe rebuffed his offer to drive her home, and Lewis gave Doe her shoes and purse, and a blanket he had in his car. Lewis denied having sex with Doe. Holler served Lewis with a search warrant to obtain his DNA. Lewis appeared nervous and admitted to having sex with Doe in his car. Lewis said they were in the car for about 45 minutes, and she was "awake" and "willing." Lewis's DNA did not match any evidence in the case.

Holler obtained Lewis's cell phone records. An expert described Lewis's location based on its activity. Lewis did not make a call while he was at Rudy's. Two calls within 30 minutes of Lewis and Doe leaving Rudy's indicated Lewis drove north to

---

[4] The interview was played for the jury.

near his home.  The phone records were inconsistent with Lewis having traveled from Rudy's to the park, which was almost four miles south of the bar.

Holler arrested Lewis.  In his home, Holler found hydrocodone in Lewis's name, and "like a knockoff version of Viagra" in a safe.  Holler did not find any Xanax, but opined it was "very easy to obtain."  She said Xanax is often put into an alcoholic drink to mask its taste.

## II.  *Defense Evidence*

Lewis testified he did not clearly remember what happened at the bar.  He arrived at Rudy's about 10:45 p.m. to meet a friend, who never arrived.  He had several drinks before meeting Doe, who appeared to be looking for something.  Lewis asked her what she was looking for, and she said her cell phone.  Lewis told her that he thought he saw someone pick up something.  He denied saying his friend picked up her phone or he would help her find her phone.  When he held his phone to his head, he was trying to send a voice text message to his friend.  Lewis bought Doe a shot and a Long Island iced tea.  He ordered two more shots.  He did not remember the bartender refusing to serve Doe.  Lewis and Doe walked outside, and he offered to drive her home.  He did not think they discussed her phone.  Lewis was intoxicated, and he believed Doe was as well.  Lewis also offered to give Lopez a ride home, but Doe said to just give her a ride home.

While Lewis drove her home, they flirted.  Doe rubbed his leg and he reciprocated.  Lewis stopped the car, and they kissed.  Doe tried to straddle Lewis in the driver's seat but could not.  Lewis slid under Doe in the passenger seat.  They had protected sexual intercourse, and he thought he ejaculated.  Lewis returned to the driver's seat and drove south to take her home.  He said they were both intoxicated.  Doe appeared to be nodding off and then abruptly asked Lewis to let her out.  Lewis exited the freeway and despite not wanting to abandon her, he let her out and gave her a blanket.  Lewis drove home.

8

Lewis admitted he initially lied to Holler about having sexual intercourse with Doe. Lewis did not think he had done anything wrong, but he did not want his wife to learn he cheated. Lewis believed Doe was capable of consenting to having sexual intercourse, and he did not intend to rape her. Lewis denied kidnapping Doe, and noted she was ahead of him as they walked out of Rudy's and he did not force her into his car. He did not take her to his home or the park. He denied having a prescription for, possessing, or giving Xanax to Doe.

Lewis offered the testimony of several family members and friends who testified to his good character. His wife testified neither Lewis nor she had ever had a prescription for Xanax or possessed it without a prescription.

*III. Jury Instructions, Closing Argument, Verdicts, New Trial Motion & Sentencing*

While discussing the jury instructions with the parties, the trial court indicated it intended to instruct the jury with CALCRIM No. 1201, "Kidnapping: Child or Person Incapable of Consent," but with the parties' agreement it "was actually a combination of" that instruction and CALCRIM No. 1203, "Kidnapping: For Robbery, Rape, or Other Sex Offenses." The court noted that at the prosecutor's request, it modified CALCRIM No. 1203's second element to state, "'Acting with that intent, the defendant used physical force or *deception* to take and carry away an unresisting person with a mental impairment.'" (Italics added.) The court overruled Lewis's objection to inclusion of "deception."

As relevant here, the trial court instructed the jury on count 2 as follows: "1. The defendant intended to commit rape of a woman while intoxicated; [¶] 2. Acting with that intent, the defendant used physical force or *deception* to take and carry away an unresisting person with a mental impairment; [¶] 3. Acting with that intent, the defendant moved the person with a mental impairment a substantial distance; [¶] . . . [¶] *Deception* includes tricking the mentally impaired person into accompanying him or her a substantial distance for an illegal purpose." (Italics added.)

9

The prosecutor's theory on count 1 was that Lewis drove Doe to his home, raped her, and "dump[ed] her." As to count 2, the prosecutor argued Lewis deceived Doe into leaving the bar with him by telling her that his friend had her phone. He also argued the following: "he kind of takes her, he takes her forearm and sort of turns her again. That's -- that's the force that this crime is getting at." Lewis's trial counsel argued they had consensual sex and Doe possibly had "buyer's remorse."

The jury convicted Lewis of both counts. Lewis filed a motion for new trial, arguing inter alia, the instructional error. At the sentencing hearing, the trial court denied the new trial motion for the reason it previously stated. The court sentenced Lewis to eight years on count 1 and a consecutive term of seven years to life on count 2.

## DISCUSSION

### I. Count 1—Instructional Error

Lewis argues the trial court erred by instructing the jury it could convict him of kidnapping to commit rape based on deception alone. We agree.

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.]" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

### A. Was there Error?

"Any person who kidnaps or carries away any individual to commit . . . rape . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." (§ 209, subd. (b)(1).) "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).)

10

Kidnap in section 209 means the same as kidnapping in section 207. (*People v. Daniels* (1969) 71 Cal.2d 1119, 1131.) "As [section 207's] language indicates, the statute generally requires that the defendant use force or fear. [Citations.] 'If a person's free will was not overborne by the use of force or the threat of force, there was no kidnapping.' [Citation.]" (*People v. Hill* (2000) 23 Cal.4th 853, 856.) Although the Legislature has expressly provided specific types of kidnapping can be accomplished by means of fraud (§ 207, subds. (b)-(d)), general kidnapping can only be accomplished by force or fear. (*People v. Stephenson* (1974) 10 Cal.3d 652, 660 (*Stephenson*).)

Since 1972, our Supreme Court has repeatedly held asportation by fraud alone does not constitute general kidnapping in California. (*People v. Rhoden* (1972) 6 Cal.3d 519, 526-527; *Stephenson,* 10 Cal.3d at p. 660; *People v. Green* (1980) 27 Cal.3d 1, 64[5]; *People v. Davis* (1995) 10 Cal.4th 463, 517, fn. 13; *People v. Majors* (2004) 33 Cal.4th 321, 327 (*Majors*); *People v. Westerfield* (2019) 6 Cal.5th 632, 712 (*Westerfield*).) Another panel of this court recognized this limitation. (*People v. Eid* (2010) 187 Cal.App.4th 859, 877, fn. 14.)

As the dissent recognizes, there is no published case holding a defendant may be convicted of kidnapping based on deception alone and absent proof of force. (Dis. opn., post, at p. 12.) There are two lines of cases where courts have recognized a reduced quantum of force was permissible in a kidnapping case. (See *Westerfield, supra,* 6 Cal.5th at p. 713.)

The first line of cases involves minors. (*Westerfield, supra,* 6 Cal.5th at pp. 639, 713-714 [seven years old]; *In re Michele D.* (2002) 29 Cal.4th 600, 603, 610-612 & fn. 5 (*Michele D.*) [one year old]; *People v. Oliver* (1961) 55 Cal.2d 761, 763, 768 (*Oliver*) [two years old]; *People v. Dalerio* (2006) 144 Cal.App.4th 775, 777, 782-783

---

[5] *Green* was overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 234.

11

(*Dalerio*) [nine years old]; *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 402 [seven years old].)  The cases involving minors are inapposite.

Doe was 22 years old at the time of the offense—she was not a minor.  The cases involving minors are inapposite.  As the *Westerfield* court stated, there is an alternative standard in kidnapping cases involving children and the showing of force required is greatly reduced.  (*Westerfield, supra,* 6 Cal.5th at pp. 713-715.)  Additionally, *Michele D.* resulted in the Legislature adding section 207, subdivision (e), which states, "For purposes of those types of kidnapping requiring force, the amount of force required to kidnap an unresisting infant or child is the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent."  (Stats. 2003, ch. 23, § 1, p. 98.)  The dissent's reliance on cases involving minors is thus misplaced.  (Dis. opn., post, at pp. 8-11.)

The second line of cases involves incapacitated persons.  (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1115 [victim had cerebral palsy]; *People v. Daniels* (2009) 176 Cal.App.4th 304, 331 (*Daniels*) [victim highly intoxicated].)  The dissent notes our Supreme Court first in *Oliver, supra,* 55 Cal.2d at page 766, and then in *Michele D., supra,* 29 Cal.4th at page 609, approved a *reduced* quantum of force requirement for the person who is forcibly transported, "because of infancy or *mental condition*[.]"  (Dis. opn., post, at pp. 8-10, italics added.)  The dissent relies on this language to rewrite section 207 to state kidnapping can be accomplished by force, fear, or deception.  (Dis. opn., post, at p. 11.)  We are not persuaded.  *Oliver* involved a two-year-old child.  (*Oliver, supra,* 55 Cal.2d at p. 763.)  *Michele D.* involved a one-year-old child.  (*Michele D., supra,* 29 Cal.4th at p. 603.)  We find no authority for the proposition *Oliver* and *Michele D.*, two cases where some force was used against children, provide any basis to hold an intoxicated *adult* victim can be kidnapped without any force, based on deception alone.  (*People v. Hartland* (2020) 54 Cal.App.5th 71, 78-79 [rejecting

defendant's claim dicta in *Oliver* supported extending rule to adult victims who lack capacity to consent.)

The only case that arguably suggests the trial court's instruction was proper is *Daniels, supra,* 176 Cal.App.4th 304, which involved an intoxicated and intermittently conscious adult who was completely incapacitated. In that case, defendant was charged with kidnapping to commit rape. (*Id*. at p. 311.) The victim was highly intoxicated, having drank about 13 shots of alcohol over a few hours. (*Id*. at p. 308.) Over defense counsel's objection, the trial court instructed the jury with a modified version of CALCRIM No. 1201 that included the following language, "the defendant used enough physical force to take and carry away an unresisting person with a mental impairment[.]" (*Id*. at p. 324.) On appeal from his conviction, defendant argued the court erred because the line of cases involving minors, specifically *Michele D.*, should not be extended to incapacitated adults. (*Id*. at p. 331.)

The *Daniels* court disagreed and relied on *Michele D.* to extend its holding to incapacitated adults. (*Daniels, supra,* 176 Cal.App.4th at pp. 331-332.) The court explained the following: "'[O]rdinarily the force element in section 207 requires *something more* than the quantum of physical force necessary to effect movement of the victim from one location to another.' [Citation.] Since an incapacitated person, like an infant, has no ability to resist being taken and carried away, the 'something more' that is 'ordinarily' required is not necessary, and 'the amount of force required to kidnap an [incapacitated person] is simply the amount of physical force required to take and carry the [incapacitated person] away . . . with an illegal intent.' [Citation.]" (*Id*. at p. 332.) The court found sufficient evidence supporting the wrongful intent instruction: "[The victim] testified that, at the point in time when defendant made contact with her in the alley, she was lying facedown, slipping in and out of consciousness, and unable to move or talk. She had no recollection of how she came to be in defendant's car. A rational jury could have readily concluded that [the victim] was incapacitated and that her state of

13

off-and-on unconsciousness coupled with her inability to move or talk was indicative of a mental impairment that precluded her giving consent at the time that defendant placed her in his car and drove away with her." (*Id.* at p. 333.)

The *Daniels* court concluded the instruction was not legally erroneous and there was sufficient evidence to support defendant's conviction. But in doing so, it articulated an important qualification. The court stated, "Our construction of . . . section 209, subdivision (b)(1)[,] relaxes but does not eliminate the force requirement." (*Daniels, supra,* 176 Cal.App.4th at p. 332.) Here, the trial court's instruction did not relax the force requirement—the instruction completely eliminated it.

We have watched Rudy's surveillance video several times. Unlike the victim in *Daniels*, Doe was not lying face down on the bar unable to move or talk. At various points Doe leaned on the bar and swerved. But she talked to Lewis and Lopez, and she was able to stand without assistance. She walked out of Rudy's on her own. The video does not show a person who was unable to stand on her own and needed to be helped out of the bar. Indeed, Weston said that although she had concerns about Doe's sobriety, she did not look "completely out of control."

*People v. Nieto* (2021) 62 Cal.App.5th 188 (*Nieto*), is instructive.[6] In that case, an information charged defendant with committing lewd acts on a child and alleged he kidnapped the victim to commit the offenses. (*Id.* at p. 192.) Over defense counsel's objection, the trial court instructed the jury with CALCRIM No. 1201 in relevant part, "The defendant used (physical force/deception) to take and carry away an unresisting child[.]" (*Id.* at p. 194.) Citing to *Majors, supra,* 33 Cal.4th at page 327, the *Nieto* court noted, "'"[A]sportation by fraud alone does not constitute general kidnapping . . . ."'" [Citation.]" (*Nieto, supra,* 62 Cal.App.5th at p. 195.) The court explained CALCRIM

---

[6]       The Fifth District Court of Appeal decided *Nieto* after briefing was complete in this case. We ordered the parties to be prepared to discuss *Nieto* at oral argument.

14

No. 1201's deceit element was based on *Dalerio, supra,* 144 Cal.App.4th 775, and distinguished that case because it was a corpus delicti case that never held deceit was a substitute for force. (*Nieto, supra,* 62 Cal.App.5th at pp. 195-196.) The court distinguished other cases involving children, including *Oliver* and *Michele D.*, because in those cases there was evidence defendants used some force. (*Nieto, supra,* 62 Cal.App.5th at pp. 196-197.) The court held the trial court erred in instructing the jury because general kidnapping cannot be proven by deceit alone. (*Id.* at pp. 191, 193, 195, 197 [deceit can supplement force but not supplant it].) Based on the instruction and the evidence, however, the court concluded the error was harmless because it was convinced beyond a reasonable doubt the jury found true each element of the offense. (*Id.* at pp. 198, 201-202.)

Here, like in *Nieto*, the trial court eliminated the force requirement completely when it permitted the jury to conclude Lewis carried away Doe by "physical force *or* deception." Based on this record, there is a reasonable likelihood one or more jurors could have concluded Lewis was guilty of kidnapping Doe based solely on the fact he deceived her. Contrary to the Attorney General's claim, other portions of CALCRIM No. 1201 did not cure the error.

Element No. 3 of CALCRIM No. 1203's form instruction states, "Using that force or fear, the defendant moved the other person [or made the other person move] a substantial distance." But here, the trial court modified element No. 3 to state, "Acting with that intent, the defendant moved the person with a mental impairment a substantial distance[.]" The court omitted the introductory clause, "Using that force or fear." California law does not allow kidnapping of an adult to be based on deception alone. The court's mash-up of CALCRIM Nos. 1201 and 1203 to include "deception" as the sole basis to convict Lewis of kidnapping to commit rape was an erroneous statement of the law.

15

What the Attorney General and the dissent do is rewrite section 207 to broaden its scope by stating a person can be guilty of kidnapping if he uses force, fear, or deception. An appellate court may not "'rewrite the clear language of [a] statute to broaden the statute's application.' [Citation.]" (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 822.) We invite the Legislature to consider this issue and, if it believes it is appropriate to do so, amend section 207, subdivision (a), to include deception. We may not.

For the last 50 years, our California Supreme Court has clearly and repeatedly stated asportation by fraud alone does not constitute general kidnapping. We must follow that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Based on section 207's clear language and well settled authority from our Supreme Court, the trial court erred by instructing the jury it could convict Lewis of count 2 based solely on the fact he deceived Doe and without having used any force against her.

*B. Was the Error Prejudicial?*

In *People v. Aledamat* (2019) 8 Cal.5th 1, 7-8, 13, our Supreme Court resolved the issue of which standard of review applies where the jury is instructed on a legally correct theory and a legally incorrect theory, concluding the federal harmless error standard of review articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 applies. The court explained that where the jury is instructed on a factually inadequate theory, "the theory is incorrect only because the evidence does not support it. [Citation.]" (*Aledamat, supra,* 8 Cal.5th at p. 7.) In contrast, a legally inadequate, or incorrect, theory is contrary to law. (*Ibid.*)

"An example of this second category 'is a case where the inadequate theory "fails to come within the statutory definition of the crime."'" [Citation.]" (*Aledamat, supra,* 8 Cal.5th at p. 7.) "When the theory is legally erroneous—i.e., of a kind the jury is *not* equipped to detect—a higher standard must be met for the error to be found harmless.

16

'These different tests reflect the view that jurors are "well equipped" to sort *factually* valid from invalid theories, but ill equipped to sort *legally* valid from invalid theories.' [Citation.]" (*Ibid*.) The court stated legal error generally, but not always, requires reversal. (*Id.* at p. 8.) The court said one method to support a finding of harmless error was "to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." (*Ibid*.) It is the Attorney General's burden to establish the jury relied on the legally valid theory in convicting the defendant. (*Id.* at p. 12; *In re Martinez* (2017) 3 Cal.5th 1216, 1227.)

We cannot conclude beyond a reasonable doubt the jury's verdict on count 2 was not tainted by the legally incorrect jury instruction. (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399.) Other portions of the verdict do not demonstrate the jury necessarily found Lewis guilty based on the legally proper theory that he used force. Additionally, Rudy's surveillance video does not unequivocally support the conclusion Lewis used force to make Doe leave the bar. Indeed, the Attorney General does not argue as much. The video shows Lewis reach for Doe's hand, put his arm around her back, and begin to usher her away from the bar. But Doe stepped ahead of Lewis and walked out of Rudy's with Lewis following her. This was not evidence from which a reasonable juror must conclude Lewis forced Doe to leave Rudy's.

The Attorney General asserts Lewis's driving constitutes the required force. It is true kidnapping is a continuous offense (*Westerfield, supra,* 6 Cal.5th at p. 714), and there can be kidnapping if a victim initially accompanies the defendant willingly, but the defendant subsequently restrains the victim's liberty by force and compels the victim to accompany him further (*People v. Camden* (1976) 16 Cal.3d 808, 814). But where the defendant entices the victim by fraud or trickery, and not force, to get into his car, our Supreme Court has determined the statutory definition of kidnapping was not met. (*People v. Stephenson* (1974) 10 Cal.3d 652, 659-660.)

17

Here, the record is devoid of any evidence Lewis forced Doe into his car or refused to let her out once she was in his car. The only evidence before the jury was Lewis's testimony that Doe asked for a ride home, and when she demanded he let her out of his car, he pulled off the highway and let her out. We acknowledge Doe could not remember what happened after she was at the bar with Lewis, and toxicology reports suggest she was under the influence of alcohol and Xanax. But we cannot speculate Lewis forced Doe into his car or once in the car restrained her liberty. Because neither the verdict nor the record before us establish Lewis used force, the legally correct theory, we are not convinced beyond a reasonable doubt the jury did not base its verdict on the legally incorrect theory, deception. We note this was a close case as illustrated by the fact the jury could not reach a verdict in the first trial. Thus, we reverse Lewis's conviction on count 2. In light of this conclusion, we need not address Lewis's other challenges to the sufficiency of the evidence on count 2.

C. *What is the Remedy?*[7]

Lewis asserts both that the instructional error requires a new trial, and there was no evidence of force. This is a situation where the distinction between the two, instructional error and insufficiency of the evidence, does make a difference.

The double jeopardy clause "prevents the state from having a second opportunity to marshal evidence which it failed to produce at the first opportunity." (*In re Mendes* (1979) 23 Cal.3d 847, 855, superseded by statute on another ground as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 254, fn. 2.) Thus, "when a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge." (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39 (*Lockhart*); *People v. Hernandez* (2003) 30 Cal.4th 1, 6-7.) "It has long been settled, however, that the Double

---

[7] On our invitation, the parties submitted supplemental briefing concerning the proper remedy.

Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." (*Lockhart, supra,* 488 U.S. at p. 38.) In other words, retrial is allowed "to rectify *trial error.*" (*Burks v. United States* (1978) 437 U.S. 1, 14 (*Burks*).) One such trial error is an erroneous jury instruction. (*Id.* at p. 15.)

*People v. Glenos* (1992) 7 Cal.App.4th 1201, is instructive. In that case, the trial court failed to instruct the jury on an element of a drug offense and the prosecution presented no evidence to prove that element. (*Id.* at p. 1211.) As to whether defendant could be retried, the court stated the following: "[W]e hold not only that the trial court erred in failing to instruct the jury with reference to an element of the offense but that, on the evidence presented, defendant could not have been convicted of [that offense] under proper instructions. It follows that '[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' (*Burks[, supra,]* 437 U.S. [at p.] 11 . . . .) Defendant's conviction . . . must be reversed and retrial is barred." (*Id.* at p. 1212.)

Here, there was an instructional error, a trial error not implicating the Double Jeopardy Clause, which would permit the prosecutor to retry Lewis. However, there was also an evidentiary void concerning the pivotal issue of force, which prohibits the prosecutor from retrying Lewis. As we explain above, neither Rudy's video surveillance nor any other evidence establishes Lewis used force to take and carry away Doe. Similar to *Glenos*, Lewis could not have been convicted of violating section 209, subdivision (b)(1), had the trial court properly instructed the jury.

It is not our practice to speculate as to the reasons for a trial lawyer's tactical decisions. But on this record we think it safe to conclude the prosecutor recognized the evidentiary deficiency on the force element and requested the trial court

19

instruct the jury that deception could supplant force. The prosecution does not get a *third* chance to marshal evidence of force to retry Lewis for kidnapping to commit rape. (See *In re D.N.* (2018) 19 Cal.App.5th 898, 903 [Double Jeopardy Clause prohibits retrial where prosecutor aware value of stolen property required to prove felony, gambled, and lost].)

The Attorney General cites to *In re Martinez* (2017) 3 Cal.5th 1216 (*Martinez*), *and People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*),[8] to support its contention retrial is proper. In those cases, the courts reversed first degree murder convictions and offered the prosecutions the choice to accept second degree murder convictions or retry the cases. (*Martinez, supra,* 3 Cal.5th at p. 1227; *Chiu, supra,* 59 Cal.4th at p. 168.) In other words, there was sufficient evidence supporting second degree murder convictions. In contrast, here there was no evidence of force to support a kidnapping conviction. Because there is insufficient evidence Lewis used force against Doe, retrial of the aggravated kidnapping charge is precluded.

## II.  Count 1—Sufficiency of the Evidence

Lewis contends there was insufficient evidence Doe's level of intoxication rendered her incapable of exercising the reasonable judgment to decide whether to consent to sexual intercourse. We disagree.

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] 'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes

---

[8]  *Chiu* was superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.

20

guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*Westerfield, supra,* 6 Cal.5th at p. 713.)

Under section 261, subdivision (a)(3), rape is committed when a defendant engages in an act of sexual intercourse where the victim "[is] prevented from resisting by any intoxicating . . . substance, . . . and this condition was known, or reasonably should have been known by the accused." The victim's intoxication level must "be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 464.)

Here, based on the evidence, it was reasonable for the jury to conclude Doe's intoxication level prevented her from exercising the judgment to decide whether to consent to having sexual intercourse with Lewis. There was evidence Doe's BAC was .18 percent at 11:00 a.m. the next morning and she had alprazolam in her system. The expert testified her BAC would have been about .35 percent an hour after she left the bar with Lewis. The expert also testified Xanax would have compounded the alcohol's effects, leading to significant cognitive and physical impairment. Weston's and Lewis's testimony supports the conclusion Doe's intoxication level impaired her judgment. Weston, who was adept at recognizing signs of intoxication, refused to serve Doe because she was swerving and leaning on the bar. Weston believed Doe was unaware how impaired she was and feared she or someone else might get hurt. More importantly, Lewis admitted he knew Doe was intoxicated.

21

During his interview, Lewis told Holler that after Doe got in his car, her head was bobbing and she was passing out. At trial, Lewis admitted he thought Doe was intoxicated when they had sexual intercourse. Doe herself confirmed her level of intoxication when she testified she did not remember anything after she and Lewis walked to the bar.

Lewis relies on Lopez's testimony Doe was not intoxicated when she was at the bar with Lewis and the expert's testimony on cross-examination her BAC would have been .13 at 1:45 a.m. We cannot reweigh the evidence. (*Westerfield, supra,* 6 Cal.5th at p. 713.) Based on the toxicology evidence and the witnesses' testimony, it was reasonable for the jury to conclude Doe's intoxication level impaired her judgment whether to consent to sexual intercourse. Sufficient evidence supports Lewis's conviction for count 1.

### III. *The Dissent*

Where the majority and the dissent part ways is in the reading of the two statutes. The majority reads rape and kidnapping as distinct and different crimes requiring significantly different elements of proof. The dissent suggests intoxication is a factor to be viewed similarly as to both crimes. Our dissenting colleague queries how a victim can be so intoxicated to render her a victim of rape while the same degree of intoxication does not render her a victim of kidnapping. The majority relies on the two statutes to answer that question.

As defined by statute, rape is an act of sexual intercourse accomplished "against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) But the statute also specifically provides that an act of intercourse is rape where a person is "prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (§ 261, subd. (a)(3).) Under the rape statute, force or fear is not required to

22

prove the crime. A seemingly consenting and willing person can be the victim of rape if it is proven the victim was too intoxicated to have given consent. The evidence establishes Doe's intoxication level rendered her incapable of consenting to intercourse.

In contrast, kidnapping is only accomplished when a person is carried away forcibly, or by any other means of instilling fear. (§ 207, subd. (a).) The kidnapping statute provides for a reduced degree of force when the victim is an infant or a child (§ 207, subd. (e)), but the issue of consent is not addressed in the general kidnapping provision (§ 207, subd. (a)). Consequently, while intoxication can vitiate consent in the crime of rape, intoxication cannot eliminate the need to prove force or fear in the crime of kidnapping.

The majority and the dissent also view the record differently in terms of Doe's state of sobriety. We find nothing in the record to support the characterization Lewis "put" Doe in the car or "poured" her into the car, or that she "passed out". In fact, the surveillance video suggests Doe was quite capable of navigating her own way in leaving the bar. We consider Doe's blood alcohol level the following morning, in conjunction with the observations made of her at the bar and testimony of witnesses, to conclude her intoxication level rendered her incapable of consenting to intercourse. Unlike our dissenting colleague, we believe the record supports a finding Doe was intoxicated but not incapacitated when she left the bar. The former suggests her judgment was impaired, the latter suggests she was incapable of exercising judgment.

Again, the majority's conclusion is based on the fact the kidnapping statute requires force or fear and makes no mention of intoxication or incapacitation. Sobriety is an issue in the context of kidnapping only because case law has attempted to add this concept to the kidnapping statute. Above we explain why the cases involving minors and *Daniels, supra,* 176 Cal.App.4th 304, do not support the conclusion the kidnapping of an intoxicated but not incapacitated adult can be based on deception alone. We remain

23

unpersuaded courts can rewrite the kidnapping statute to eliminate the statutory requirement of force or fear.

## DISPOSITION

We reverse Lewis's conviction on count 2 due to instructional error. Because there was insufficient evidence to sustain a kidnapping for rape conviction, the prosecutor cannot retry him on that count. In all other respects, we affirm the judgment.


O'LEARY, P. J.

I CONCUR:


GOETHALS, J.


24

BEDSWORTH, J., Concurring and Dissenting.

I concur in my colleagues' majority opinion in all respects, save one. On that point, I respectfully dissent.

My colleagues agree the victim in this case was too intoxicated to consent to having sexual intercourse with appellant, and therefore he is guilty of rape. However, the majority believes the victim was somehow capable of consenting to being assisted out of the bar, into the car, and driven away to be raped. They therefore conclude appellant is not guilty of that offense because he did not use force or fear to move her before the rape. Based on my reading of the kidnapping cases in this state, force or fear is not required to satisfy the asportation requirement of kidnapping when, as here, the victim is incapacitated due to intoxication. Therefore, I would not only affirm appellant's conviction for raping an intoxicated person, I would also affirm his conviction for kidnapping for rape.

FACTS

In August 2011, Suzanne Doe was a 22-year-old Irish au pair living in Mountain View, just south of Palo Alto. She had just begun dating Diego Lopez, her future husband,[1] and was interested in taking their relationship to the next level. So, when her host family left for vacation on August 19, she invited Lopez over to their house for dinner. Lopez arrived around 9 p.m., and over dinner they shared a bottle of wine. Then, around 11, they took a taxi to a college bar in Palo Alto called Rudy's.

When they got to the bar, Lopez ordered a round of "adios motherfuckers," a potent drink that contains four shots of alcohol. Thinking the drink too strong, Doe only drank about a third of hers. However, the drink did not go to waste; Lopez finished

_____

[1]      Doe and Lopez married in 2016.

1

the rest, in addition to his own. He was feeling "pretty happy" at that point, and Doe was feeling "tipsy, a little drunk."

As the night wore on, Rudy's became more and more crowded. By the time Lopez and Doe hit the dance floor at midnight, the place was packed, and music was blaring throughout the bar. Lopez and Doe danced for about 20 minutes before Doe suddenly realized she could not find her phone. Because the phone belonged to her host family, Doe was very worried about losing it, so she and Lopez began looking all around the bar for the device.

As they were searching, they became separated. While Lopez was in another part of the bar, appellant approached Doe and asked what she was looking for. When Doe said her phone, appellant told her that his friend had found a phone and that he would give him a call. That was a lie. In fact, appellant was by himself at the bar that night, and he had no idea where Doe's phone was. But Doe believed his story. She was happy and relieved at the prospect of getting her phone back and accepted appellant's invitation to have a drink at the bar while he attempted to contact "his friend."

Doe has no memory of what happened after that. At trial, she testified the next thing she remembered after talking to appellant about her phone was waking up in the hospital around 11:00 a.m. the following day with abrasions on her lower back and bruising on her extremities. At that time, her blood-alcohol concentration (BAC) was .18 percent, and she had Xanax, an anti-anxiety medication, in her system.[2] A sexual assault exam revealed Doe had a small laceration on her posterior fourchette and swelling and redness on her labia minora.

She had been taken to the hospital earlier that morning after a woman found her lying unconscious in a park about three miles from Rudy's. When paramedics arrived there, Doe was groggy and disheveled, with her dress hitched up and her

_____

[2] The source of the Xanax was never conclusively established. Doe said she did not take it, and appellant and Lopez both denied giving it to her.

2

underwear partly pulled down. All she could remember about the previous evening was that she had lost her phone at Rudy's, and when she told this to a man there, he told her, "I know where it is. Come with me."

As it turned out, Rudy's was equipped with surveillance cameras that captured what took place after Doe lost her phone and accompanied appellant to the bar for drinks. That surveillance footage was played for the jury at trial and supplemented by testimony from Lopez, appellant, and the bartender, Erica Weston. Based on these evidentiary sources, the following facts emerged.

After their initial conversation about the phone, appellant and Doe made their way up to the bar at 12:36 a.m. Appellant promptly ordered a round of Long Island iced teas for himself and Doe, along with an extra shot of tequila for Doe.[3] While they were waiting for the drinks to arrive, appellant pulled out his phone and held it up to his ear, as if he were making a call, but, according to appellant's phone records, he did not actually call anyone at that time.

Before long, Lopez also arrived at the bar. He took up a standing position behind Doe and appellant, who were also standing, but he was not involved in their conversation. Instead, he was talking and dancing with other patrons in the area. Thus, he did not notice that Doe was being friendly with appellant and even kissed him on the cheek after he made the fake phone call.

When the drinks arrived, appellant slid the shot and one of the Long Island iced teas over to Doe, and she promptly gulped the former and began sipping the latter. Two minutes later, appellant ordered two more shots of tequila. However, Weston did not want to provide anymore liquor to Doe. Having worked as a bartender for 14 years, she felt Doe was displaying signs she was too intoxicated to keep drinking. In particular, Doe was leaning heavily on the bar, "like the bar was holding her up." She also seemed

---

[3] Weston testified that in terms of alcohol content, a Long Island iced tea is very similar to an adios motherfucker. She said those are two of the strongest drinks you can order in a bar.

3

to be swerving a bit and somewhat incoherent.  Although Doe did not look "completely out of control," Weston believed she was unaware how impaired she was and unable to understand the consequences of continuing to drink.  Fearing Doe might get hurt, or hurt someone else, Weston told appellant that she was not going to serve her anymore alcohol.

That angered appellant.  Claiming he knew the owner of Rudy's, he told Weston he would get her fired if she did not comply with his drink request.  When that tactic proved futile, he falsely asserted that the tequila shots were for him and his friend, not Doe.  Eventually, Weston capitulated and brought appellant the shots.  After she turned away to serve other customers, appellant chugged one of the shots and Doe chugged the other.

Around this time, Lopez tapped Doe on the shoulder, and she turned around to talk to him.  Doe's demeanor seemed fine to Lopez; she was not stumbling around or "too drunk" to carry on a conversation.  However, Lopez does not remember what they talked about at that time.  By that point, he had already consumed the equivalent of eight or nine alcoholic drinks and was, by his own admission, pretty inebriated.

While Lopez and Doe were talking, appellant also turned around to talk to Lopez briefly.  In so doing, appellant positioned himself between Lopez and Doe, so she ended up turning back around to face the bar.  After that, appellant reached for Doe's wrist, slipped his arm around her back and began to usher her away from the bar.  Doe responded by placing her arm around appellant's back momentarily.  Then she stepped ahead of him and led him by the hand through the crowd.  Lopez tried following them, but the bar was so crowded he was unable to do so.  Not knowing Doe and appellant had then left the bar together, he stayed behind and danced some more before eventually taking a cab home by himself.

Based on this evidence, the prosecution theorized appellant tricked Doe into leaving the bar with him by promising to get her phone back.  However, appellant testified that was not the case.  In fact, he claimed that after he and Doe initially talked

4

about her losing her phone, they did not talk about the phone at all. Nor did Doe mention she was with Lopez. So, when Doe got affectionate with him at the bar, he thought she might be available. He does not remember Weston refusing to serve Doe any more drinks after the first round, but he does recall that Doe was drunk by the time she left the bar with him.

Once they were outside, Doe asked for a ride home, and he obliged. Along the way, she became flirtatious and began rubbing his leg. Appellant pulled over in a residential area, and they started kissing. Then he slid over into the passenger seat, she positioned herself on top of him and they had sexual intercourse. According to appellant, the whole episode was consensual. At Doe's request, he even put on a condom before they engaged in coitus.

Afterwards, appellant began driving Doe home on the 101 South. Although Doe seemed very tired at the time, appellant did not get the sense she was agitated or upset. However, as they were driving, she suddenly got very anxious and demanded to be let out of the car. Appellant didn't like the idea of abandoning Doe in the middle of the night. However, at her insistence, he exited the 101 and ultimately dropped her off near the park where she was found later that morning. According to appellant, Doe was not perturbed during the drop off; she simply took a blanket he had offered her and walked off into the night. Appellant then got back on the 101 and drove north to his home in San Mateo.

A week later, the police contacted appellant and spoke to him about the incident.[4] During the first part of the interview, appellant denied having sex with Doe, but after investigators told him they had a warrant to obtain his DNA, he admitted having intercourse with her in his car. He also admitted Doe was very woozy when they left the bar together. Although appellant claimed Doe was "more awake" when they had

---

[4] Investigators were able to identify appellant as the man at the bar with Doe because he used his credit card to pay for their drinks.

intercourse later on, he said her head was bobbing *and she was passing out* when she first got into his car.

At trial, the prosecution presented cellphone evidence showing appellant was near his home in San Mateo about fifteen minutes after he and Doe left Rudy's. The prosecution used this evidence to refute appellant's claim that he was having consensual sex with Doe in Palo Alto at that time, and to prove he actually took Doe back to his place to rape her.

In the end, the jury convicted appellant as charged of kidnapping for rape and raping an intoxicated person. (Pen. Code, §§ 209, subd. (b)(1), 261, subd. (a)(3).)[5] The trial court sentenced him to prison for seven years to life, plus a consecutive term of eight years, for his crimes.

## DISCUSSION

### *Instructional Issue*

In instructing the jury on the kidnapping charge, the trial court defined asportation to include movement of the victim by the use of deception. The majority concludes this was reversible error because the asportation element of kidnapping can only be satisfied upon proof that the victim was moved by force or fear. For the reasons explained below, I disagree and would uphold the trial court's charge to the jury.

Appellant was convicted of violating section 209, which states, "Any person who kidnaps or carries away any individual to commit . . . rape . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." (§ 209, subd. (b)(1).) For purposes of this statute, the term "kidnaps or carries away" has the same meaning as the asportation requirement for simple kidnapping in section 207. (*People v. Daniels* (1969) 71 Cal.2d 1119, 1131.) That section provides, "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains or

---

[5] All further statutory references are to the Penal Code.

6

arrests any person in this state, and carries the person into another . . . part of the same county, is guilty of kidnapping."  (§ 207, subd. (a).)

By its terms, section 207 requires the victim's movement to be accomplished by force or fear.  However, per CALCRIM No. 1201, the trial court instructed the jury the asportation requirement of kidnapping for rape could be satisfied in this case if, acting with the intent to rape an intoxicated woman, appellant "used physical force *or deception* to take and carry away an unresisting person with mental impairment" for a substantial distance.  (Italics added.)[6]

The trial court further instructed, "A person with a mental impairment may include unconscious or intoxicated adults incapable of giving legal consent.  A person is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences.  [¶] Deception includes tricking the mentally impaired person into accompanying him or her a substantial distance for an illegal purpose."

The majority finds it was improper for the trial court to include the term deception as a means of satisfying the asportation requirement of kidnapping for rape. However, under the circumstances presented in this case, I believe movement by deception was an appropriate basis upon which to find that requirement was met.  While force or fear is generally required to satisfy the asportation requirement of kidnapping (*People v. Majors* (2004) 33 Cal.4th 321, 327 [asportation by fraud or deceit alone will not suffice]), courts have tempered that requirement when, due to age or mental incapacity, the victim is unable to lawfully consent to being moved.

The first case to recognize incapacitated people need special protection under the kidnapping law is *People v. Oliver* (1961) 55 Cal.2d 761 (*Oliver*).  There, the defendant was convicted of kidnapping for leading a two-year-old boy by the hand through an alley and behind a fence, where he eventually molested him.  Even though the

---

6    CALCRIM No. 1201 applies when the defendant is accused of kidnapping a person who is incapable of giving consent.

boy went *willingly* with the defendant, the Supreme Court was not troubled by that aspect of the case because the boy was too young to give his legal consent to being taken by the defendant. (*Id*. at p. 764.) Indeed, the court was quite clear the kidnapping statute was intended to apply to cases where, "because of infancy or mental condition," the victim was incapable of consenting to the movement. (*Id*. at p. 766.) However, to ensure the statute was not invoked against those who acted for good or innocuous reasons, e.g., a person who moved a child or a highly intoxicated person out of harm's way to a place of safety, the court added an important caveat. When the alleged victim is unable to consent due to "immaturity or mental condition," the movement must be done for "an illegal purpose or with an illegal intent" in order to satisfy the asportation requirement of kidnapping. (*Id*. at p. 768.)

In the present case, the jury was instructed in accordance with this rule. It was told the asportation element of the kidnapping charge required proof that Doe was mentally impaired due to intoxication *and* that appellant moved her with the intent of raping her in that condition. Thus, the question before us is whether it was proper to include deception as a permissible method of movement.

*Parnell v. Superior Court* (1981) 119 Cal.App.3d 392 (*Parnell*) suggests it was. In that case, the defendant and his cohort fraudulently induced a seven-year-old boy into their car and retained him against his will for an extended period of time thereafter. Even though the initial taking was not accomplished by force or fear, the *Parnell* court upheld the defendant's kidnapping conviction because the victim was subjected to "physical and psychological confinement" after he entered the car. (*Id*. at p. 402.) That part of the court's analysis amounted to a straight-forward application of the force or fear requirement. However, *Parnell* also recognized the victim's age precluded him from legally consenting to any movement. (*Id*. at p. 402, fn. 3.) Therefore, even if he had not been forcibly confined after the initial taking, the defendant could still have been liable for kidnapping under the reasoning of *Oliver*, which "implied that the kidnapping of a

8

minor can be accomplished even if unaccompanied by force so long as it was done for an improper purpose . . . ." (*Ibid.*, quoting *Oliver, supra*, 55 Cal.2d at pp. 764-765.)

In *In re Michele D.* (2002) 29 Cal.4th 600 (*Michele D.*), the California Supreme Court endorsed *Parnell*'s interpretation of *Oliver* with respect to the consent issue. Recognizing "the consent and force elements of kidnapping are clearly intertwined[,]" the court explained: "If, as we observed in *Oliver*, the child victim went 'willingly' with defendant [in that case], the implication is that force was not used against him. Thus, our holding in *Oliver* – that, where the victim by reason of youth or mental incapacity can neither give nor withhold consent, kidnapping is established by proof that the victim was taken for an improper purpose or improper intent – was reasonably extended in *Parnell* . . . to encompass [the] situation [where], because of the victim's youth, there is no evidence the victim's will was overcome by force." (*Michele D., supra*, 29 Cal.4th at p. 609; see also *People v. Hill* (2000) 23 Cal.4th 853, 860 ["*Oliver* did not require an affirmative showing that the taking was against the child's will. It sufficed if the taking was for an unlawful purpose."].)

Nevertheless, *Michele D.* might be read as including mixed signals on the degree to which the force requirement for kidnapping could be relaxed or eliminated in cases involving an unresisting infant or child who was taken for an unlawful purpose. On the one hand, the Supreme Court stated the defendant must still use enough force to take and carry the child away for a substantial distance. (*Michele D., supra*, 29 Cal.4th at p. 610.) But on the other hand, the court indicated a kidnapping conviction could be sustained in the "narrow class of cases in which an unresisting infant or small child is taken away without *any* force or fear." (*Id.* at p. 612, fn. 5, italics added.) At the very least, the *Michele D.* court recognized "infants and young children are in a different position vis-à-vis the force requirement for kidnapping than those who can apprehend the force being used against them and resist it." (*Id.* at p. 610.)

9

That difference was illustrated in *People v. Dalerio* (2006) 144 Cal.App.4th 775 (*Dalerio*).  The defendant in that case was convicted of kidnapping for fraudulently inducing a nine-year-old girl to accompany him to a remote area of a park, where he attempted to murder her.  The defendant had lured the victim to the park under the false pretense that her friends were there, and once she arrived, he "led the way up a trail to [the exact] place he claimed her [friends] were located."  (*Id*. at p. 778.)

On appeal, the defendant argued there was insufficient evidence to satisfy the corpus delicti rule because, apart from his own admissions, there was nothing to suggest he physically moved the victim.  However, relying on *Oliver* and *Parnell*, the *Dalerio* court disagreed.  It determined the absence of a physical taking was immaterial because due to the victim's tender age, she lacked the capacity to appreciate the danger the defendant put her in.  (*People v. Dalerio, supra*, 144 Cal.App.4th at p. 782.)  Under those circumstances, it was held sufficient that the defendant deceived her into walking with him a substantial distance from a place of relative safety to a place where she was highly susceptible to his attack.  (*Id*. at p. 783.)

On the heels of *Dalerio*, *People v. Daniels* (2009) 176 Cal.App.4th 304 (*Daniels*) applied the reasoning of that decision to the kidnapping of an incapacitated adult.  Like Doe in our case, the victim in *Daniels* was so intoxicated on the night of the kidnapping that at trial she could not remember getting in the defendant's car.  (*Id*. at p. 309.)  As a matter of fact, she was so impaired she was fading in and out of consciousness and – like our victim – having difficulty walking and talking.  (*Ibid*.)  Unlike our victim, she was not passing out as she was poured into an automobile.[7]  Given her drunken state, the *Daniels* court determined she was no more able to resist being moved than a child, and therefore it was proper to relax the force or fear requirement of

---

[7]     My colleagues object to this description and say they believe the evidence shows Doe was less intoxicated than this.  But that was a call for the jury to make, not us. The *appellant himself* said she was passing out, and the jury was entitled – based on CALJIC No. 1201, which I find unobjectionable – to base their verdict on *their* analysis of the facts, not ours.

10

kidnapping to allow the defendant's conviction merely upon proof that he used enough force to take her away for an illegal purpose. (*Id*. at p. 332.)

More recently, in *People v. Westerfield* (2019) 6 Cal.5th 632 (*Westerfield*), the California Supreme Court reaffirmed the principle that an "alternative standard" of asportation applies when the kidnapping victim is an infant or young child. (*Id*. at p. 714.) The *Westerfield* court still went through the trouble of showing there was sufficient evidence of force or fear to satisfy the asportation standard that typically applies in kidnapping cases. (*Id*. at pp. 713-714.) But it stated that even if the young victim in that case was persuaded to leave her home by trickery, as opposed to force or fear, "she could not have legally consented and was still kidnapped if she was taken away a substantial distance for an illegal purpose or with an illegal intent." (*Id*. at p. 714.)

All of these cases point me in the direction of a rule that kidnapping can – under narrowly drawn exceptional cases – be accomplished without force or fear. But the latest case bearing on the asportation issue is *People v. Nieto* (2021) 62 Cal.App.5th 188, which was decided just this spring. In *Nieto*, the court criticized CALCRIM No. 1201, the instruction given here, because it allowed the jury to convict the defendant of kidnapping if he used force *or deception* to take and carry away an unresisting child. The *Nieto* court did not believe deception alone was sufficient to satisfy the asportation requirement of kidnapping, nor did it believe that *Dalerio* so held. It interpreted *Dalerio* as a case involving movement by physical force, not sheer deception, and it also distinguished the Supreme Court's decision in *Oliver* on that basis. (*Nieto, supra*, 62 Cal.App.5th at pp. 195-197.) While recognizing *Dalerio* and *Oliver* both spoke to the force or fear requirement in child kidnapping cases, the *Nieto* court did not believe those cases eliminated that requirement altogether. (*Ibid.*) Therefore, it concluded "CALCRIM No. 1201 is wrong and inapplicable in cases involving kidnapping 'by deception alone . . . .' [Citations.]" (*Id*. at p. 197.)

11

I don't think so.  The California Supreme Court has repeatedly endorsed the view that *Oliver* permits a conviction for kidnapping when a child is moved a substantial distance without force or fear, so long as the movement was achieved for an illegal purpose.  Although the Supreme Court has never squarely held as much, I believe *Oliver* and its progeny support the conclusion that kidnapping an adult similarly incapable of giving consent can be based on either force *or* deception.  This conclusion is particularly compelling in a case such as this, where appellant actively contributed to the victim's incapacitation by plying her with alcohol before getting her to leave the bar with him and admitted she was so intoxicated that she was passing out when he put her into his car.

Appellant argues that regardless of how *Oliver* and its progeny interpreted the asportation element of kidnapping in cases involving infants or young children, those decisions are not controlling here because Doe was a full-grown adult when he allegedly kidnapped her.  But in *Oliver*, the Supreme Court repeatedly stated its interpretation of the asportation requirement was intended to apply whenever the victim, by reason of infancy, immaturity "or mental condition," was unable to consent to being moved. (*Oliver, supra*, 55 Cal.2d at pp. 766 & 768.)  And in *Michele D.*, they characterized *Oliver*'s holding in similar terms.  (*Michele D., supra*, 29 Cal.4th at p. 609 [using the phrase "youth or mental incapacity"].)  I would therefore decline appellant's invitation to limit the holding of *Oliver* to cases involving infants or young children.  Since alcohol and drugs can easily reduce an adult's mental acuity to that of a child, the reasoning of *Oliver* applies with equal force to adult victims, as illustrated by the Sixth District's opinion in *Daniels*.

Appellant and the majority believe *Daniels* is distinguishable because Doe was not as intoxicated as the victim was in that case.  However, as detailed below, the evidence shows Doe was certainly sufficiently impaired that a jury could conclude she was too intoxicated to realize appellant was using a powerful combination of drink and deception to coax her out of the bar.  Doe may have been able to walk and talk at that

12

time – though she was leaning on the bar and slurring her words – but like the victim in *Daniels*, she lacked the capacity to legally consent to being moved, due to her inebriated condition. Because there is substantial evidence that Doe did not exercise her free will in accompanying appellant to his car, the trial court's instruction on the asportation requirement of kidnapping was correct. The instruction properly allowed the jury to find that requirement satisfied upon proof that defendant took advantage of Doe's mental impairment by luring her out the bar under false pretenses for the purpose of raping her. It was, and should have been, their call whether she was too inebriated to consent. Accordingly, I would reject appellant's claim of instructional error.

Even assuming the kidnapping instruction was defective for defining asportation to include movement by deception, I would affirm on harmless error grounds. If my colleagues are correct, the instruction included a legally valid theory of asportation, i.e., movement by force, and a legally invalid theory, i.e., movement by deception. When the jury is instructed on both a legally valid and a legally invalid theory of culpability, the beyond-a-reasonable-doubt standard of harmless error applies. (See *Chapman* v. *California* (1967) 386 U.S. 18; *People v. Aledamat* (2019) 8 Cal.5th 1.)

However, contrary to appellant's belief, the jury's verdict need not affirmatively demonstrate he was convicted under a legally valid theory in order to satisfy this standard. (*People v. Aledamat, supra,* 8 Cal.5th at pp. 9-13.) Therefore, we do not have to be convinced beyond a reasonable doubt the jury actually relied on the legally valid theory of asportation by force in finding appellant guilty of the kidnapping charge. Instead, based on the record as a whole, including the evidence and all relevant circumstances, we simply have to be convinced the inclusion of the legally invalid theory of asportation by deception was harmless beyond a reasonable doubt. (*Ibid*.)

I am confident that it was, given the evidence adduced at trial. Had the deception theory been omitted, and had the prosecution been required to prove Doe was moved by force, all it would have had to show is that appellant, acting with unlawful

13

intent, used enough force to take and carry her away a substantial distance while she was mentally incapacitated. (*Michele D., supra*, 29 Cal.4th at pp. 609-610; *Daniels, supra,* 176 Cal.App.4th at p. 332; *Dalerio, supra,* 144 Cal.App.4th at pp. 782-783.)

In finding appellant guilty of kidnapping for rape, the jury necessarily determined that Doe was mentally incapacitated due to intoxication and that appellant intended to rape her in that condition when they left the bar together. Although it is certainly possible that he did not use force to effectuate Doe's departure from the bar, the evidence firmly established he subsequently drove her away from the bar in his car. Indeed, appellant admitted in his trial testimony and in speaking with the police before trial that he drove Doe from the bar to the park where she was subsequently discovered later that morning.

This undisputed fact is important because kidnapping is a continuing offense, and the asportation requirement does not have to be proven based solely on the initial movement of the victim. Rather, it can be satisfied at any point during the commission of the kidnapping. (*Westerfield, supra*, 6 Cal.5th at p. 714.) By driving Doe away from the bar, appellant clearly and indisputably used enough force to move her a substantial distance while the kidnapping was in progress. Therefore, even if the jury had not been instructed on the legally invalid theory of movement by deception, it still would have found the asportation requirement satisfied based on the legally valid theory of movement by force. Under these circumstances, any error in defining asportation to include movement by deception was harmless beyond a reasonable doubt. (See *People v. Mil* (2012) 53 Cal.4th 400, 417 [instructional error will be deemed harmless beyond a reasonable doubt if it relates to an element of the charged offense that was indisputably or overwhelmingly established at trial].)

At the very least, the matter should be remanded to permit the prosecution to retry appellant on the charge of kidnapping for rape. In his opening brief, appellant argued, "The instructional error [on that charge] requires a new trial." He did not claim

14

the error *precludes* a retrial. Yet, that is precisely what the majority concludes, providing appellant a windfall I don't believe the law requires.

According to the majority, this result is justified on double jeopardy grounds because deception alone cannot suffice to support a kidnapping charge, and because there is no evidence appellant moved Doe by force or fear. However, appellant admits the prosecution was free to request an instruction that allowed him to be convicted of the kidnapping charge based on the reduced standard of force that is applicable when the victim is incapacitated, i.e., force that is merely sufficient to effectuate the victim's movement. And, as the majority admits, there was substantial evidence to support the jury's determination Doe was too intoxicated to legally consent to appellant's sexual advances. Doe may not have been as intoxicated as the victim in *Daniels*, but that doesn't matter because the trial court's duty to instruct on a theory arises whenever there is substantial evidence to support it. (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

Here, there was an abundance of evidence Doe's intoxicated condition rendered her particularly vulnerable to being sexually exploited. And we know from the jury's findings that appellant intended to rape her in that condition when they left the bar together. Therefore, even though appellant did not use force or fear to get Doe to leave the bar with him, he is guilty of kidnapping for rape for effectuating her movement thereafter, *when he drove her away from the bar*. That is why any error in the trial court's kidnapping instruction was harmless beyond a reasonable doubt, and that is why a retrial should not be barred if the judgment is reversed.

*Sufficiency of the Evidence*

Appellant also argues the record is bereft of substantial evidence to support his convictions. He simply argues Doe was not intoxicated enough for him to notice that she was incapable of consenting to being moved or engaging in sexual intercourse. I believe the evidence was sufficient for the jury to conclude otherwise. Therefore, I concur with the majority's sufficiency-of-the-evidence analysis, as far as it goes.

15

However, for the reasons explained below, I would extend that analysis to cover not only the rape charge, but the kidnapping charge, as well.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.)  Our task is to "'"examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]'" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)  "Although we must ensure the evidence is reasonable, credible, and of solid value," we must keep in mind "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment . . . .'  Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction.  [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

To prove the kidnapping and rape charges against appellant, the prosecution not only had to show Doe was intoxicated due to alcohol and/or drugs, it also had to establish appellant knew or should have known Doe's intoxication rendered her incapable of legally consenting to leaving the bar with him and having sexual intercourse. (See CALCRIM Nos. 1201, 1001.)  The record shows Doe's BAC was .18 percent at 11:00 a.m. the morning after her encounter with appellant.  Based on that figure, a toxicology expert opined Doe had at least nine drinks over the course of the previous evening, and her BAC would have been about .35 percent an hour after she left the bar with appellant.  That is more than four times the point where our state prohibits driving and represents a number most drivers cannot reach without passing out – a fact which later was proven when Doe in fact passed out.  The expert also testified the Xanax in

16

Doe's system would have compounded the effect of her alcohol consumption, leading to significant impairment of her cognitive and physical abilities.

Nonetheless, appellant claims Doe was not actually acting that drunk when they were at the bar together, so he had no reason to know how impaired she was. Appellant stakes that claim largely on the testimony of Lopez, who was Doe's new boyfriend at the time and later became her husband. Lopez testified that Doe seemed to be fine, and not "too drunk," when she was at the bar with appellant. During that time, Lopez did speak with Doe for a moment, but he was mostly dancing and conversing with other patrons in the bar. Not only was his attention primarily focused away from Doe, he was intoxicated himself – "drunk happy" as he put it in his testimony – from having consumed a large amount of alcohol that evening.

Barkeep Weston, in contrast, consumed but one drink that evening, and she was able to observe Doe face-to-face for a considerable period of time. Based on her extensive experience tending bar, she felt Doe was too drunk to keep drinking after she polished off the first shot of tequila that appellant bought for her, which is why she tried to cut off Doe at that point. It wasn't just that Doe was leaning heavily on the bar and showing signs of physical impairment. Weston also gathered that Doe did not have a very good sense of what was going on around her and could end up getting hurt, or hurting someone else, because she was so intoxicated. She took the extreme step of 86ing her. Given Weston's experience and her ability to observe Doe first-hand, the jury was fully entitled to credit her opinion that Doe appeared to be heavily intoxicated and incapable of rendering sensible judgment.

Weston wasn't the only person at the bar who thought Doe was intoxicated. During his testimony, appellant readily admitted that Doe looked *drunk* to him when they left the bar together. And before trial, he told the police that Doe could *barely keep her head up* and *appeared to be passing out when she first got into his car*. Of course, we also know that Doe eventually did pass out that night, and she has no memory of what

appellant did to her after they departed Rudy's. This makes it hard to argue appellant had no way of knowing she was incapacitated.

And finally, there is appellant's statement to the police. Unless he knew Doe was largely incoherent when they had intercourse, and thus incapable of refuting his story, it is hard to imagine why he would have denied having sex with her. Yet, that is precisely what he did until investigators informed him that they had a warrant to obtain his DNA.

Viewing all the evidence in the light most favorable to the prosecution, as we are required to do, I would conclude there was substantial evidence to support the jury's finding appellant knew or should have known Doe was incapable of consenting to leaving the bar with him and incapable of consenting to sexual intercourse. I think the CALJIC instruction correctly reflects the law, and I would uphold these convictions and affirm the judgment in its entirety.

BEDSWORTH, J.

18